**STATE of Missouri, Respondent,**

v.

**Krystal M. SCROGGS, Appellant.**

**WD 79068**

Missouri Court of Appeals,
Western District.

OPINION FILED: April 4, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2017

Application for Transfer Denied June 27, 2017

650

Richard A. Starnes, Jefferson City, MO, for respondent.

Samuel E. Buffaloe and Ellen H. Flottman, Columbia, MO, for appellant.

Before Division Three: Victor C. Howard, Presiding Judge, Gary D. Witt, Judge and Zel M. Fischer, Special Judge

Gary D. Witt, Judge

Krystal M. Scroggs ("Scroggs") appeals from her convictions following a jury trial before the Circuit Court of Johnson County for one count of class A felony murder in the second degree, section 565.021,[1] one count of endangering the welfare of a child, section 568.045, and one count of abandonment of a corpse, section 194.425. The charges arise out of the death, shortly after birth, of Scroggs's newborn son. Scroggs raises three points on appeal arguing that there was insufficient evidence to convict her of endangering the welfare of a child (Point One) and murder in the second degree (Point Two), and that the trial court erred in excluding certain evidence at trial (Point Three). We affirm.

## Factual Background

In 2013, Scroggs and her husband Matthew Scroggs ("Matthew")[2] were living in Pleasant Hill, Missouri with their three children. During the summer, Matthew's mother, Melinda Brown ("Brown") was caring for the children at her home a

---

1. All statutory citations are to RSMo 2000 as updated through the most recent cumulative supplement, unless otherwise indicated.

2. Because Krystal and Matthew Scroggs share the same surname, we will refer to Matthew Scroggs as Matthew. No familiarity or disrespect is intended.

couple hours away from Pleasant Hill. In early June of 2013, Brown took the three children to visit Pleasant Hill. Brown noticed that Scroggs appeared to be pregnant. She returned again in July and noticed that Scroggs's breasts were enlarged, she had gained weight in her stomach, and her nose was red. This was consistent with how Scroggs looked during her previous pregnancies. Brown asked Scroggs whether she was pregnant, and Scroggs angrily denied it multiple times.

Their children were returned by Brown to Scroggs and Matthew in August. Brown received a call from Matthew on November 4, 2013, requesting that Brown come to his home. When Brown arrived, Matthew looked like he had not slept and was exhausted, as if he were "crashing." His mood vacillated between sadness and anger. The three children were not at home. Matthew first patted Brown down, as if he were searching for something, and then forced Brown to hand over her keys and cell phone because he wanted to tell her something but did not want her to leave. Matthew informed Brown that Scroggs had delivered a baby at home and was in the hospital. Brown asked where the baby was, and Matthew responded, saying, "[a]ll you need to know is that we took care of it." Matthew also told Brown that there was a stolen car between their garage and a fence.

Brown spoke with law enforcement and told them a stolen car was located on the property, which she had seen the day before, and relayed the information she had received from Matthew about the baby. She informed police that she believed Scroggs and Matthew had disposed of the baby's body and that they both deal in drugs.

When police arrived, Matthew was placed under arrest and gave his consent for a search of the residence. Police found four glass pipes used for smoking methamphetamine that had white residue on them. An additional thirty unused glass pipes were located in the upstairs of the home along with bags containing marijuana, methamphetamine residue, and additional marijuana pipes.

Police discovered a blue bucket in the garage filled with what appeared to be recently poured concrete. Matthew later admitted that the baby's body was in the bucket and gave permission to police to remove it. The bucket was taken to the medical examiner, who removed and examined the contents. The baby was located in the concrete inside a cardboard box for baby wipes and inside a plastic bag that also contained pacifiers, a bottle, a bib, a baby bottle brush, and formula. An additional plastic bag was also in the bucket containing the placenta wrapped in a towel. At the bottom of the bucket was a truck brake rotor.

Scroggs was interviewed twice while in the hospital. She had been admitted for pneumonia and congestive heart failure. Police asked her if she was aware she had given birth to a baby boy on October 7. Scroggs hesitated and stated the birth had taken place a few days after that. Scroggs had learned that she was pregnant in June but she did not want any more children. Scroggs did not obtain any prenatal care or seek any medical treatment during her pregnancy. Although her previous three children had been born in a hospital, she said that she "wanted to do it like they did back in the day." She did not obtain a midwife to help with the birth, and she and Mathew had not told anyone about the pregnancy, not even their children. Scroggs admitted to police that she used methamphetamine and marijuana throughout her pregnancy. She told a Children's Division investigator that she had only used methamphetamine prior to the preg-

nancy but when told that hair follicle tests would be able to determine whether that was true, she said they would probably find methamphetamine in her system and that she could not remember the last time she had used it.

Scroggs claimed the baby was born somewhere between five and seven months into the pregnancy and that after he was born the baby looked fine. She claimed that she called a doctor after the birth, whom she picked out of a phone book, and the doctor told her that as long as there was not excess bleeding, everything was okay and there was nothing else she could do. Scroggs did not remember who this doctor was and could not provide any information regarding the doctor's identity.

Scroggs stated that after the birth the baby would not breast feed or take a bottle. She told police that she thought he would eventually eat, so she went to sleep. Scroggs stated that when she woke up, the baby was "gone," as in deceased. She also stated that she had heard him make a whimpering sound before he died. After she woke up and found the baby dead, she put the child in a box and gave it to Matthew and told him to "bury it in the backyard." However, Scroggs also told a detective, after she got out of the hospital, that she knew the baby was in the garage and said she told Matthew not to bury him yet because she wanted to wait until she was healthy enough to help bury the baby.

An autopsy was performed on the baby that determined he was born alive and appeared to be full term. There were no signs of injury or congenital abnormalities. The baby had a methamphetamine level in his system of 751 ng/mL. Scroggs had to have used methamphetamines a few days prior to the birth in order for the baby to have this level of methamphetamines in his system at birth. This level of methamphetamine would have created stress, increased

heart rate, and increased blood pressure in the baby. This would have created a risk of heart attack, seizure, stroke, or arrhythmia, which could have caused sudden death. The baby's cause of death was "methamphetamine intoxication due to maternal methamphetamine use." Had the baby been taken to the hospital, he could have been diagnosed and treated, as there are interventions that could have increased his likelihood of survival. A medical expert testified that the failure to seek medical treatment contributed to the baby's death.

Scroggs was found guilty after a jury trial on all three counts. The court sentenced Scroggs to concurrent terms of life for second-degree murder, seven years for endangering the welfare of a child, and four years for abandonment of a corpse. Scroggs now appeals.

## Point One

In Point One, Scroggs argues the trial court erred in overruling her motion for judgment of acquittal at the close of all the evidence and imposing judgment and sentence against her for murder in the second degree and endangering the welfare of a child because the evidence was insufficient to prove beyond a reasonable doubt that she knew or should have known that by failing to obtain medical care for her baby, she was creating substantial risk to the life, body, and health of her baby.

An appellate court's review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) [ (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).] All evidence and inferences favorable to the State are accepted as

true, and all evidence and inferences to the contrary are rejected. *State v. Stover*, 388 S.W.3d 138, 146 (Mo. banc 2012).

*State v. Hansen*, 449 S.W.3d 781, 784–85 (Mo. banc 2014).

[T]his inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010) (quoting *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998)).

Scroggs was charged in Count II of the Information for endangering the welfare of a child, section 568.045, in that the Information alleged that Scroggs "knowingly acted in a manner that created a substantial risk to the life and body and health of [the Victim] [. . .] by failing to obtain medical care for [the Victim]."[3] "Knowingly" is defined by section 562.016.3 as follows:

A person "acts knowingly," or with knowledge:

(1) With respect to his or her conduct or to attendant circumstances when he or she is aware of the nature of his or her conduct or that those circumstances exist; or

(2) With respect to a result of his or her conduct when he or she is aware that his or her conduct is practically certain to cause that result.

Scroggs argues that there was insufficient evidence presented at trial that she acted "knowingly" and, thus, her conviction cannot be upheld.

This Court has previously explained that "[a] parent's failure to provide or obtain adequate medical care for a child can be the basis for a child endangerment conviction." *State v. Rinehart*, 383 S.W.3d 95, 101 (Mo. App. W.D. 2012). Regarding the knowledge required to sustain a conviction, we have also explained that

"[t]here is no bright line test to determine whether or not a person's actions knowingly create a substantial risk to the health of a child." [*State v. Burrell*, 160 S.W.3d 798, 802 (Mo. banc 2005)] (quoting *State v. Hunter*, 939 S.W.2d 542, 545 (Mo. App. E.D. 1997)). Instead, the determination as to whether a defendant acted knowingly is based on the totality of the circumstances. *Id.*; *State v. Manwarren*, 139 S.W.3d 267, 272 (Mo. App. S.D. 2004). "The State may prove a defendant's knowledge by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." *Burrell*, 160 S.W.3d at 802; *see also State v. Riggs*, 2 S.W.3d 867, 873 (Mo. App. W.D. 1999).

*Id.* at 103.

Because direct evidence of someone's state of mind is rarely available, intent may be inferred from circumstantial evidence. *Id.* "Even in a circumstantial evidence case, the evidence need not be conclusive of guilt, nor must the evidence exclude every hypothesis of innocence." *Id.* (quoting *State v. Martin*, 882 S.W.2d 768, 770 (Mo. App. E.D. 1994)).

We find, based on the totality of the circumstances, that the evidence presented at trial supports a finding that Scroggs knowingly acted in a manner that created

---

**3.** Section 568.045.1 provides, as relevant here, that "[a] person commits the offense of endangering the welfare of a child in the first degree if he or she: (1) Knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years of age."

a substantial risk to the life of the baby. The evidence at trial was that Scroggs and Matthew concealed Scroggs's pregnancy, even lying to Matthew's mother when directly asked if she was pregnant. They were the only two people who knew about the baby's existence. As opposed to Scroggs's previous three births in the hospital, Scroggs chose to have the child at home without any help from a midwife or any other person, whether medically trained or not. Scroggs admitted she used methamphetamine during her pregnancy. The baby's autopsy established that she had used methamphetamines shortly before the baby's birth. Scroggs sought no prenatal care or any other medical care during her pregnancy. After the child was born, Scroggs admitted that the baby would not eat. Rather than seek medical help, she went to sleep. After the fact, she created a ludicrous story that she called an unidentified doctor she picked out of the phonebook after the birth who told her everything was fine without seeing her or the child. The child died shortly after birth. Rather than contact the appropriate authorities, Scroggs and Matthew decided to clandestinely dispose of the child's body. Scroggs's conduct before, during, and after the pregnancy are all indicative that she knew her methamphetamine use would harm her child. The jury could infer that Scroggs's failure to obtain medical care for her child after birth was consistent with her previous conduct; she knew her drug use would harm her child and she knowingly chose not to seek medical care for the child to hide her illicit drug use. *See Rinehart*, 383 S.W.3d at 104 (defendant's actions supported inference that his failure to seek medical care for infant was due to his attempt to hide illicit activity).

Self-serving testimony by Scroggs that she believed the baby was fine after birth could have been and was disregarded by the jury. *See id.* at 100 ("The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.") Contrary to Scroggs's argument on appeal, the State's theory of the case would not convict any woman who had done anything to potentially harm her fetus during pregnancy who chooses a home birth. The circumstantial evidence here is strongly corroborative of Scroggs's intent, which includes: (1) lying during and after pregnancy about her pregnancy; (2) refusing any sort of prenatal care; (3) use of illegal drugs during her pregnancy and, specifically, just before the birth; (4) lying after birth regarding her alleged call to a doctor; and (5) the disposal of the child's body in a bucket of cement. The holding here is not as broad as Scroggs suggests. We find that the evidence at trial was sufficient to support the jury's finding that Scroggs knowingly acted to create a substantial risk to the life, body, and health of her baby in her failure to obtain medical care for the child.

Point One is denied.

## Point Two

■ In Point Two on appeal, Scroggs argues that the trial court erred in overruling her motion for judgment of acquittal at the close of all evidence and in imposing judgment and sentence against her for murder in the second degree because the evidence was insufficient to prove beyond a reasonable doubt that her failure to obtain medical care caused her baby's death. The standard of review for this point is the same as Point One and will not be repeated.

Section 565.021.1(2) provides that a person commits the crime of second-degree murder if she "[c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such

felony [...], another person is killed as a result of the perpetration or attempted perpetration of such felony [....]" Scroggs's conviction for second-degree murder was based on the underlying felony of endangering the welfare of a child for her failure to obtain medical care, discussed in Point One. Scroggs argues in Point Two that her conviction for second-degree murder cannot be sustained because there was insufficient evidence that her baby "died as a result of that felony." Rather, she argues the cause of death was her felony methamphetamine use and not her felony failure to obtain medical care for the child.

■ "Missouri follows the foreseeability-proximate cause theory of felony murder in interpreting whether a death resulted from the perpetration of a felony." *State v. Stallman*, 289 S.W.3d 776, 779 (Mo. App. E.D. 2009). A defendant is, therefore, "responsible for any deaths that are the natural and proximate result of the commission of a felony." *Id.*

In Point One, we have already determined that the evidence was sufficient to find that Scroggs committed a felony by knowingly acting in a manner that created a substantial risk to the life and body and health of the baby by failing to obtain medical care for him. The evidence at trial was that the baby was born with a substantial level of methamphetamine in his system as a result of Scroggs's own methamphetamine use while pregnant. Medical testimony at trial established that although the methamphetamine level was very high, medical intervention could have diagnosed and treated the baby's medical conditions resulting from the methamphetamine in his body.

■ Contrary to Scroggs's argument on appeal, the State is not required to prove strict "but for" causation to convict Scroggs of second-degree murder. Rather,

Scroggs in the commission of the felony of endangering the welfare of a child is responsible for any death that is the natural and proximate result of the commission of that felony. Death of a newborn infant is the natural and foreseeable consequence of failing to provide medical care where, as is the case here, the mother *knows* that she consumed methamphetamines during pregnancy and immediately before birth. The substantial risk of harm, for which Scroggs was convicted of endangering the welfare of a child, came to fruition in her child's death. The death of her child was the natural and proximate result of the felony for which Scroggs was convicted. *See Burrell*, 160 S.W.3d at 803 (Sustaining felony-murder conviction based on felony of child endangerment where "[t]he evidence establishes the continuing abuse to Child and the clear causal relation between Mother's conduct in placing Child in contact with Father, refusing to seek timely medical attention, and the death of Child"). In Missouri, it is inconsequential that Scroggs's conduct was not the immediate cause of death; it is sufficient that the conduct was a contributing cause of death. *See Stallman*, 289 S.W.3d at 779 (upholding conviction for felony murder where defendant's felony initiated a manhunt, and an emergency responder died in a motor vehicle accident during his attempt to apprehend defendant).

The foreign authorities identified by Scroggs with similar factual scenarios are not binding or persuasive. Each of the three cases she cites comes from jurisdictions with a stricter causation requirement than the standard established in our State. *See Commonwealth v. Pugh*, 462 Mass. 482, 969 N.E.2d 672, 688 (2012) ("Proximate cause is a cause, which, in the natural and continuous sequence, produces the death, and *without which the death would not have occurred.*") (emphasis added);

*State v. Muro,* 269 Neb. 703, 695 N.W.2d 425, 430 (2005) ("Conduct is a cause of an event if the event in question would not have occurred but for that conduct [....]"); *Ex parte Lucas,* 792 So.2d 1169, 1170 (Ala. 2000) ("A person is criminally liable if the result would *not* have occurred *but for his conduct* [....]"). Missouri's causation test is not a "but for" test but a "foreseeability-proximate cause test," which, as explained above, has been satisfied under these facts. The death of Scroggs's baby was the natural and proximate cause of her choosing to create a substantial risk to the life, body, and health of her baby in her failure to obtain medical care for her baby when she knew the child was born after her substantial and recent methamphetamine use during her pregnancy.

Point Two is denied.

### Point Three

■ In Point Three on appeal, Scroggs argues that the trial court erred in excluding evidence that her husband told a police officer during an interrogation that he had acted alone in disposing of the baby's body and that Scroggs did not know what happened to the body because this deprived her of her right to due process, a fair trial, and a meaningful opportunity to present a complete defense in violation of the Sixth and Fourteenth Amendments, in that Matthew's statement was made under circumstances providing considerable indicia of reliability, it would have exonerated the defendant, it was self-incriminatory, and unquestionably against interest, and it was corroborated by other evidence in the case.

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Blurton,* 484 S.W.3d 758, 769 (Mo. banc 2016). "A trial court's decision regarding the exclusion or admissibility of evidence is reviewed for an abuse of discretion." *Id.* "A trial court abuses its discretion only if its decision to admit or exclude evidence is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (quoting *Lozano v. BNSF Ry. Co.,* 421 S.W.3d 448, 451 (Mo. banc 2014)). *State v. Pennington,* 493 S.W.3d 926, 931 (Mo. App. W.D. 2016).

Scroggs argued to the trial court that her husband Matthew's statements to law enforcement during their investigation regarding his acting alone in disposing of the baby's body should have been admitted at trial. The State opposed the admission of these statements because it argued they constituted hearsay and, in Missouri, a declaration against penal interest is not a recognized exception to the hearsay rule. Scroggs countered that under the principles set forth in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), due process required the statements to be admitted. The trial court agreed with the State and did not allow the statements to be admitted at trial.

■ On appeal, Scroggs only argues the statements should have been admitted under *Chambers,* so our discussion will be restricted thereto. In Missouri, there is no general exception to the hearsay rule for statements against penal interest except insofar as the Supreme Court's ruling in *Chambers v. Mississippi* requires such statements to be admitted to comport with due process. *See State v. Davidson,* 982 S.W.2d 238, 242 (Mo. banc 1998); *State v. Proudie,* 493 S.W.3d 6, 11 (Mo. App. E.D. 2016). Pursuant to *Chambers,* a declaration against penal interest "may be admissible as a due process right of the defendant only if the declarant is shown to be unavailable as a witness, there are consid-

erable assurances of the statement's reliability, and the statement, if true, would exonerate the defendant." *Davidson,* 982 S.W.2d at 242.

 *Chambers* set forth three indicators of reliability as follows: the statement needs to be (a) unquestionably against interest, (b) spontaneously made to a close acquaintance, and (c) corroborated by other evidence in the case. *Id.* (citing *Chambers,* 410 U.S. at 300–01, 93 S.Ct. 1038). All three indicia of reliability must be satisfied before the statements may be admitted under *Chambers. See State v. Anglin,* 45 S.W.3d 470, 473 (Mo. App. W.D. 2001); *State v. Williams,* 958 S.W.2d 87, 91 (Mo. App. E.D. 1997).

The statements that Scroggs seeks to have admitted under *Chambers* fail to satisfy the reliability requirements to support their admission. As readily conceded by Scroggs in briefing, Matthew's statements were neither spontaneous nor made to a close acquaintance. To the contrary, the statements were made to law enforcement during their investigation of criminal activity. This is the exact opposite of a spontaneous statement made to a close acquaintance. This alone precludes the admission of the proposed testimony under *Chambers. See Anglin,* 45 S.W.3d at 473 (failure to prove that the statement was spontaneously made to close acquaintance alone justifies the trial court's exclusion of testimony from trial).

In addition, Scroggs fails to identify any other evidence in the case that corroborates Matthew's statements. She states, without any explanation, that the statements are corroborated because Scroggs was in the hospital for a large amount of time after the baby's birth. We fail to see how this corroborates Matthew's claim that he acted without Scroggs's knowledge regarding the mistreatment of the baby's body considering Scroggs was present at the baby's death and Scroggs stated to the police that she placed the baby's body in a cardboard box and told Matthew to bury him in the yard. Scroggs has not identified any evidence that plausibly corroborates Matthew's statements to justify their admission under *Chambers.*

The trial court did not abuse its discretion in refusing to admit Matthew's statements against penal interest pursuant to *Chambers.*

Point Three is denied.

### Conclusion

The judgment and sentence of the trial court are affirmed.

All concur