

# In the Missouri Court of Appeals
# Eastern District

DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI | ) | No. ED108263 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Francois County |
| v. | ) | |
| | ) | |
| ROBERTA JEAN BAKER, | ) | Honorable Wendy Wexler Horn |
| | ) | |
| Defendant/Appellant. | ) | Filed: October 20, 2020 |

Introduction

Roberta Jean Baker (Appellant) appeals from the judgment of the trial court entered after a bench trial convicting her of the class B felony of abuse or neglect of a child. We reverse.

Factual and Procedural Background

In September or October of 2017, Appellant learned she was pregnant with her fourth child. At that time, Appellant had custody of her youngest daughter and her mother was the legal guardian of her two oldest daughters. During the pregnancy, a parole warrant was issued for Appellant's arrest due to her failure to report to probation and parole. Appellant also admitted to using methamphetamine both before and during the pregnancy.

Appellant never sought prenatal care. Instead, Appellant took prenatal vitamins, conducted research on pregnancies, and relied on her past experiences. Appellant's water started leaking on either February 19 or 20, 2018. At that time, Appellant contacted her friend Amy

1

Harris (Amy) on Facebook. Amy said she had experience delivering babies as a medical assistant and offered to help her with the homebirth. Appellant accepted and Amy came over with supplies. Also present in the house during labor were Josh Felty (Josh), the supposed father; William Bertelsmeyer (William), Appellant's uncle; Dawn Smith (Dawn), William's girlfriend; and Steve Watkins, but only Appellant and Amy were in Appellant's bedroom.

Appellant had her fourth child, Elijah Baker (E.B.) at approximately 3:30 a.m. on February 22, 2018. E.B. was born extremely premature, weighing less than 3 pounds. However, upon handing him to Appellant, Amy assured her that his lungs were okay. Appellant also thought he looked great. At that point, Appellant took to Facebook, messaging friends with pictures of her baby.  Josh, William, and Dawn went to Walmart to buy baby supplies.

Over the next day, Appellant cared for and fed E.B. Appellant did not notice any issues with him and thought he appeared small but healthy. However, at roughly 3:30 a.m. on February 23, 2018, Appellant weighed him and discovered he weighed just two pounds and eleven ounces. At 3:41 a.m., Appellant texted Dawn and stated she was "scared af" because of the baby's weight.

Thereafter, Appellant fell asleep with E.B. Around 5:30 a.m., Appellant woke up to a sound and saw the baby looked "a little discolored" and "was struggling" to breathe. Appellant panicked and brought him to Dawn and William to see what they thought. They contacted Appellant's mother who called 911 and performed CPR as the baby's condition deteriorated.

Officer Andrew Rieger was the first to respond and he immediately took over CPR. An ambulance arrived a minute later and took E.B. to a hospital, where he was pronounced dead at 6:24 a.m. on February 23, 2018. As the baby was taken away in the ambulance, Appellant was placed under arrest.

Appellant was interviewed three times by Detective Matthew Wampler (Det. Wampler) with the St. Francois County sheriff's office. In her first interview, Appellant lied to Det. Wampler, claiming the birth occurred on February 23, 2018, with no one else present. Appellant then sought a second interview to correct her statements. Appellant also consented to searches of her phone and Facebook account during the interviews.

Appellant claimed she did not seek medical attention because she thought E.B. was healthy and she did not want to lose custody due to her drug use and outstanding warrant. Appellant also testified that she would have gone to a doctor immediately if anything was wrong.

Appellant was charged by a second substitute information with the class A felony of neglect of a child. Due to her criminal record, Appellant was charged as a prior and persistent offender. The information alleged Appellant caused E.B.:

> to suffer physical injury as a result of neglect by not seeking medical care for premature child and as a result [E.B.] (D.O.B. 2/22/2018) died of injuries sustained from this conduct.

Before trial, Appellant submitted a memorandum waiving her right to a jury trial and thereafter a bench trial occurred. At trial, the court heard testimony from Vicky Morse, Appellant's mother; Paul Morse, Appellant's stepfather; Officer Andrew Rieger; Detective Clyde Kenneth Wakefield; Dr. Russell Deidiker (Dr. Deidiker), a forensic pathologist; Det. Wampler; and Appellant. Dr. Deidiker was the only expert witness presented during trial.

Dr. Deidiker performed the autopsy of E.B. Dr. Deidiker testified he found material in the baby's stomach, which indicated live birth. Dr. Deidiker also testified he measured E.B. and determined gestation was approximately 28 to 30 weeks and E.B. was at least 10 weeks premature. Dr. Deidiker considered this state of prematurity to be extreme. Dr. Deidiker stated the complications associated with extreme prematurity "[p]rimarily are respiratory difficulties.

3

The lungs are just beginning to mature at around 28 weeks or so. So, children born at 28 to 30 weeks may have difficulty breathing, may have difficulty utilizing oxygen which can also then cascade into other problems because of the lack of oxygen to various organs, such as the brain." Dr. Deidiker also testified 24 to 28 weeks "has kind of been a major breaking point, where prior to that survival was much less likely, whereas after that, survival becomes more – where there's a greater chance of survival."

Dr. Deidiker ordered a toxicology report, which found methamphetamine in the baby's blood. Although Dr. Deidiker did not know what methamphetamine levels were toxic in infants, he testified the methamphetamine "may have caused the prematurity." Nonetheless, Dr. Deidiker restated "the cause of death was complications of prematurity."

During both direct and cross-examination, Dr. Deidiker was repeatedly questioned about E.B.'s chances of survival if he were born in a hospital or had medical care summoned immediately upon his birth. Dr. Deidiker did not give a precise answer. Instead, he stated that in the absence of medical attention, the baby had "zero chance of survival." Dr. Deidiker then admitted he could not estimate how enhanced E.B.'s survival odds would have been had he been born in a hospital, explaining "each case is individual." Dr. Deidiker only went so far as to say it would have been "less likely" the baby would have died if born in a hospital.

On May 16, 2019, the trial court found Appellant guilty of the lesser offense of class B felony of abuse or neglect of a child. At the sentencing hearing on July 19, 2019, Appellant asked the court to reconsider its decision in light of new caselaw, citing State v. Usnick, 585 S.W.3d 298 (Mo. App. W.D. 2019). However, the trial court held Usnick only further justified its decision to find Appellant guilty of the lesser version of the crime, which does not require death to result, because it could not say with confidence that Appellant's actions caused the

4

baby's death. The court stated "you could have done everything right and the baby may not have survived. And we also know that to be the case." The court explained that it found Appellant guilty of the lesser crime because there was a "physical injury that [created] a substantial risk of death." The court held it "was convinced beyond any doubt that the act of not getting any medical treatment immediately upon the birth of this child certainly caused a substantial risk of death, and that was based on the testimony of Dr. Deidiker, and again, given other evidence that I found."

Appellant was sentenced to 20 years in prison. This appeal follows.

Points Relied On

Appellant makes two claims of error on this appeal. Point I claims the trial court erred in finding Appellant guilty because the State did not present sufficient evidence to prove beyond a reasonable doubt that Appellant's neglect caused E.B.'s injuries and substantial risk of death. Point II claims the trial court plainly erred by proceeding without a jury because Appellant did not clearly waive her right to a trial by jury.

Point I

*Standard of Review*

Appellant's sufficiency of evidence claim is automatically preserved for appellate review. State v. Claycomb, 470 S.W.3d 358, 361 (Mo. banc 2015) ("[Appellant's] claim that the evidence was insufficient to support his conviction is preserved on appeal even if not raised or not timely raised in the trial court."). Additionally, "[t]he standard of review in a court-tried case is the same as in a jury-tried case." State v. McKinney, 253 S.W.3d 110, 113 (Mo. App. W.D. 2008).

5

In determining whether evidence is sufficient to support the conviction, this Court's role is "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002). We accept as true all evidence and reasonable inferences which support the conviction, and ignore all contrary evidence and inferences. State v. Ess, 453 S.W.3d 196, 206 (Mo. banc 2015). However, this Court "may not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences." State v. Clark, 490 S.W.3d 704, 707 (Mo. banc 2016) (quoting State v. Whalen, 49 S.W.3d 181, 184 (Mo. banc 2001)).

*Discussion*

Appellant argues the trial court erred in overruling her motion for judgment of acquittal at the close of all evidence and finding her guilty of the class B felony of abuse or neglect of a child because the State's evidence was insufficient to prove beyond a reasonable doubt that her neglect knowingly caused E.B.'s physical injuries and resulting substantial risk of death. Section 568.060.2[1] defines the felony of abuse or neglect of a child as:

> A person commits the offense of abuse or neglect of a child if such person *knowingly causes* a child who is less than eighteen years of age:
>
> (1) To suffer physical or mental injury as a result of abuse or neglect; or
>
> (2) To be placed in a situation in which the child may suffer physical or mental injury as the result of abuse or neglect.

(emphasis added).

Section 568.060.1(4) defines neglect as:

> [T]he failure to provide, by those responsible for the care, custody, and control of a child under the age of eighteen years, the care reasonable and necessary to

---

[1] Statutory citations are to RSMo 2016, unless otherwise noted.

6

maintain the physical and mental health of the child, when such failure presents a substantial probability that death or physical injury or sexual injury would result[.]

Specifically, Section 568.060.5 states:

5. The offense of abuse or neglect of a child is:

(1) A class D felony, without eligibility for probation, parole, or conditional release until the defendant has served no less than one year of such sentence, unless the person has previously been found guilty of a violation of this section or of a violation of the law of any other jurisdiction that prohibits the same or similar conduct or the injury inflicted on the child is a serious emotional injury or a serious physical injury, in which case abuse or neglect of a child is a class B felony, without eligibility for probation or parole until the defendant has served not less than five years of such sentence; or

(2) A class A felony if the child dies as a result of injuries sustained from conduct chargeable under the provisions of this section.

Section 568.060.1(5) defines physical injury as:

[P]hysical pain, illness, or any impairment of physical condition, including but not limited to bruising, lacerations, hematomas, welts, or permanent or temporary disfigurement and impairment of any bodily function or organ[.]

Section 568.060.1(7) defines serious physical injury as:

[A] physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

Appellant argues the plain wording of the statute requires the State prove she knowingly caused the baby's physical injury and substantial risk of death due to her neglect. We agree. The State had the burden to prove beyond a reasonable doubt that Appellant's neglect knowingly caused E.B.'s physical injury and the resulting substantial risk of death.

In State v. Usnick, Usnick was convicted of first-degree involuntary manslaughter following the death of her newborn daughter. Usnick did not tell anyone she was pregnant and smoked meth and marijuana the night before giving birth. Id. at 301. On January 15, 2009,

7

Usnick began experiencing pain and contractions, so she went into the bathroom and began pushing. Id. Eventually, the baby came out and landed in the toilet. Id. Usnick was only able to pull the baby out of the toilet after taking a few minutes to recover. Id. at 302. At that point, she noticed the baby was not breathing and feared the baby drowned or suffocated in the toilet. Id. Usnick then got dressed, placed the baby in a plastic bag which she put in a tote, and put the tote in the trunk of her car. Id. Usnick did not mention what happened to anyone and told the presumed father she had given the baby away to a cousin in Mexico. Id. On February 3, 2009, the police discovered the baby while conducting an unrelated methamphetamine investigation. Id. Usnick initially denied the baby was hers. Id.

Usnick was charged with second degree murder for having recklessly caused the death of her baby. At trial, three physicians testified regarding the baby's death. Dr. Carl Stacy performed the autopsy and testified the baby could have been resuscitated if born in the hospital or in the presence of someone with medical training. Id. at 303. Dr. Christopher Long conducted the toxicology report and determined there was methamphetamine in the baby's internal organs, meaning the baby's heart had to be beating for the drugs to transfer from Usnick into the baby's tissues. Id. Finally, Dr. Douglas Miller testified that he did not find anything in the baby's brain which would have contributed to the cause of death. Id. Ultimately, the jury found Usnick guilty of the lesser included offense of involuntary manslaughter for recklessly causing the death of her baby "by giving birth to said child unattended and failing to secure assistance and medical attention for said child following birth and by enclosing [the] child in a plastic bag and container." Id. at 301, 304.

On appeal, the Western District emphasized State v. Wade, 232 S.W.3d 663, 665 (Mo. App. W.D. 2007), which holds that mothers cannot be prosecuted for indirect harm caused to

8

their unborn children by ingesting illegal drugs during pregnancy. Usnick, 585 S.W.3d at 305.

Next, the court held "Usnick's medically unattended delivery of Baby Usnick cannot support

criminal prosecution as a matter of law." Id. at 305. The court then turned to the issue of whether

Usnick's failure to secure assistance or medical attention following birth caused the baby's

death. Moreover, while it was unclear whether Baby Usnick was alive at birth, the court assumed

the baby was alive and instead focused its inquiry upon whether Usnick's post birth actions and

inactions caused her baby's death. Id. The court emphasized "[t]he State is required to prove the

cause of death beyond reasonable doubt." Id. Additionally, the court discussed the "corpus

delicti," which requires the State to prove the criminal agency of another caused the victim's

death. Id. Notably, because "[h]ypoxia can result from natural causes as well as criminal acts,"

the State needed to prove the death was "caused by a criminal act" and not "self-inflicted, due to

natural causes, or an accident." Id. at 305-06. Examining the medical testimony, which "was the

entirety of the evidence submitted by the State to establish the cause of Baby Usnick's hypoxia

[death]," the court held:

> Even when read in the light most favorable to the verdict, the testimony of the
> expert witnesses was that the cause of the hypoxia (the theory of death entered by
> the State) was unknown and merely that had the birth been attended by a medical
> professional, Baby Usnick may have survived. We have already explained why
> Baby Usnick's unattended birth cannot support criminal culpability. None of the
> expert witnesses testified that but for Usnick's failure to seek medical assistance
> after Baby Usnick's birth, Baby Usnick would not have died.

Id. at 307.

The court found it significant that the medical testimony did not "determine within a

reasonable degree of medical certainty a clear cause of death" and therefore there would be no

way for a lay juror to determine whether the death was caused by a criminal act as opposed to a

natural cause. Id. at 308. The medical testimony "left open the possibility that Baby Usnick's

9

oxygen deprivation was due to natural causes." Id. at 306. Notably, "there was no evidence to support a finding that immediately summoning medical assistance after the birth would have prevented Baby Usnick's death" and therefore, "there was insufficient evidence to submit this to the jury as a cause of Baby Usnick's death." Id. at 308.

In contrast, the State points to State v. Scroggs, 521 S.W.3d 649 (Mo. App. W.D. 2017) as the applicable precedent. In Scroggs, Scroggs and her husband did not tell anyone of her pregnancy. 521 S.W.3d at 652. Scroggs used methamphetamine and marijuana throughout her pregnancy. Scroggs stated the baby was born between five to seven months into the pregnancy and initially looked fine. Id. at 653. Scroggs also claimed to have called a doctor, whom she picked out of a phone book, who told her everything was fine. Scroggs went to sleep and when she woke up, the baby was dead. At that point, she put the baby in a box and gave him to her husband, who subsequently put the baby in a blue bucket and filled the bucket with concrete. Id. at 652-53. The crime was eventually discovered when Scroggs's mother-in-law reported them to the police. Id. at 652. An autopsy later revealed the baby appeared to be full term and had a methamphetamine level of 751 ng/mL in his system. It was determined the baby's cause of death was "methamphetamine intoxication due to maternal methamphetamine use." Id. at 653. A jury found Scroggs guilty of child endangerment, felony murder, and abandonment of a corpse. Id.

On appeal, the Western District affirmed the trial court's judgment. The court first noted "[a] parent's failure to provide or obtain adequate medical care for a child can be the basis for a child endangerment conviction." Id. at 654 (quoting State v. Rinehart, 383 S.W.3d 95, 101 (Mo. App. W.D. 2012)). Next, the court addressed the main issue, whether Scroggs acted "knowingly" under the child endangerment statute.[2] Scroggs, 521 S.W.3d at 654. The court explained that

---

[2] There is no requirement that the defendant actually cause harm to the child under Missouri's child endangerment statute.

10

proving a state of mind, such as knowing, is rarely possible and thus "knowingly" can be proven based on the totality of the circumstances, including from circumstantial evidence. Applying this standard, the court held the evidence sufficient to establish Scroggs acted knowingly, in a manner which created a substantial risk to the baby. The court stated "Scroggs's conduct before, during, and after the pregnancy are all indicative that she knew her methamphetamine use would harm her child."[3] Id. at 655. The court also reasoned the jury could have disregarded Scroggs's testimony as not credible. Finally, the court addressed the second-degree felony murder charge, holding the death was a natural and proximate result of the defendant's felony of child endangerment.[4] Id. at 655-56.

Usnick and Scroggs show the significant discretion granted to prosecutors in deciding how to charge cases involving failure to seek care for newborns. Prosecutors are free to choose between charging child endangerment, child neglect, or involuntary manslaughter, with the potential to add a felony murder charge. Here, the State charged Appellant with child neglect, which, as both parties agreed during oral argument, is a statute that specifically requires the defendant to "knowingly cause" a child to suffer harm. Therefore, like involuntary manslaughter, child neglect requires causation to be proven beyond a reasonable doubt.[5] In contrast, child endangerment contains no such requirement and can lead to conviction in cases where the

---

[3] To the extent Scroggs utilizes circumstantial evidence from before the baby's birth such as drug use and failure to seek prenatal care, we find reliance on such evidence in violation of Usnick, 585 S.W.3d 298 (regarding unattended birth) and Wade, 232 S.W.3d 663 (regarding drug use).

[4] The State cites to numerous felony murder cases to argue that Appellant is responsible for any injuries that are the natural and proximate result of the commission of the felony. However, this is not a felony murder case and the contributing proximate cause standard does not govern here.

[5] The Missouri Supreme Court has long held that actual, "[b]ut for [causation] is an absolute minimum for causation because it is merely causation in fact." Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852, 862 (Mo. banc 1993). "[A]ctual causation, or causation in fact, is the same analytically in criminal law and tort law." State v. Burton, 370 S.W.3d 926, 931 n.3 (Mo. App. E.D. 2012).

defendant did not cause harm. Thus, while both Usnick and Scroggs were frequently cited by the parties, we find Usnick to be more applicable to the case at hand.

Like in Usnick, here the evidence is not sufficient to establish that Appellant's post-birth neglect knowingly *caused* E.B. to suffer physical injuries resulting in a substantial risk of death. While Usnick presented the medical testimony of three experts, here the only medical testimony came from Dr. Deidiker, a forensic pathologist who admitted that questions regarding treatment were better suited for a neonatologist. Dr. Deidiker did not "provide an opinion within a reasonable degree of medical certainty" as to whether Appellant's inaction caused the baby to suffer physical injuries resulting in a substantial risk of death. Usnick, 585 S.W.3d at 306. While Dr. Deidiker did state with confidence that E.B.'s injuries and death were due to extreme prematurity, potentially brought about by Appellant's methamphetamine use, this Court cannot consider Appellant's actions before the baby's birth. Wade, 232 S.W.3d at 665. Dr. Deidiker did not provide testimony explaining how Appellant's failure to get E.B. medical treatment caused his physical injuries. Instead, all of Dr. Deidiker's post-birth medical testimony focused on the baby's preexisting injuries from having been born extremely premature. Again, these are injuries and a resulting risk of death which we cannot consider because Appellant's post-birth actions did not cause them.

Accordingly, we find the trial court supplied missing evidence and gave "the State the benefit of unreasonable, speculative or forced inferences." Clark, 490 S.W.3d at 707. The trial court held that because Appellant's neglect created a substantial risk of physical injury, the risk itself was sufficient to show injury. However, without medical testimony, we cannot conclude that but for Appellant's failure to seek medical treatment, E.B. would not have suffered the same

12

physical injuries.[6] "He thus offered no opinion permitting a reasonable inference that the cause of [injury and death] was a criminal act, and was not instead a natural peril of child birth." Usnick, 585 S.W.3d at 306. See also Patel v. State, 60 N.E.3d 1041, 1052–53 (Ind. Ct. App. 2016) ("[T]he State was required to prove beyond a reasonable doubt that the baby's death would not have occurred but for Patel's failure to provide medical care immediately after its birth."). The trial court should not have supplied missing evidence for the State and inferred injury from Appellant's failure to seek medical treatment.

Similarly, the State failed to provide any medical testimony explaining how medical treatment would have alleviated E.B.'s injuries. Without such testimony, we cannot conclude that Appellant's failure to seek medical attention caused the baby to suffer physical injuries and a resulting substantial risk of death. Only a forced inference would allow us to reach a conclusion that medical treatment would have prevented E.B.'s injuries and resulting substantial risk of death. Without medical testimony, we cannot conclude that but for the baby not receiving treatment, he would not have suffered the same physical injuries.

In conclusion, the State did not provide clear proof that Appellant's inaction caused E.B.'s serious injuries and substantial risk of death, and therefore we see no way a factfinder could have found such evidence to be sufficient. As in Usnick, examining the medical testimony

---

[6] The State has also argued in its brief that the offense of neglect of a child could have been committed by knowingly causing E.B. "to be placed in a situation in which the child may suffer physical injury as the result of abuse or neglect." Section 568.060.2(2). In reply, Appellant has argued that allowing such a variance between the actual charge and the basis submitted for conviction would result in a due process violation. Additionally, we do not find that portion of the statute applicable for two reasons. First, that section still requires Appellant to have knowingly caused the situation. Therefore, without more, we do not see why causation would be met under that section when it still cannot be shown that E.B. suffered physical injury as a result of Appellant's inaction, as opposed to as a result of his extreme prematurity. Second, we are not convinced that Section 568.060.2(2) even applies to situations such as this. E.B. was already in the precarious situation the moment he was born extremely premature and Appellant cannot be criminally responsible for having birthed him. The State cited a child endangerment case for its support but the medical testimony was significantly different, State v. Fowler, 435 S.W.3d 90, 95 (Mo. App. S.D. 2014), and logically it would appear Section 568.060.2(2) should apply in situations such as when a parent leaves a child with someone they know to be dangerous or abusive.

13

which was the entirety of the State's case as to the cause of E.B.'s death, even when read in a light most favorable to the verdict, there was no evidence that immediately summoning medical attention after the birth would have prevented or alleviated the baby's physical injuries. For this reason, we reverse and remand.

Point II

Because we reverse Appellant's class B felony of abuse or neglect of a child in Point I, we need not address Appellant's second claim that the trial court plainly erred when it proceeded to trial without a jury absent a clear jury waiver from Appellant in open court and entered of record.

Conclusion

The judgment of the trial court is reversed. We enter judgment of acquittal and order appellant discharged.

_____

SHERRI B. SULLIVAN, J.

Robin Ransom, P.J., and
Lisa P. Page, J., concur.

14