Karen King Mitchell, Judge
Anthony Balbirnie appeals, following a jury trial, his convictions of second-degree (felony) murder (§ 565.021),[1] second-degree statutory rape (§ 566.034), tampering with physical evidence (§ 575.100), and abandoning a corpse (§ 194.425). Balbirnie raises two claims on appeal, both challenging the sufficiency of the evidence to support *705 his convictions. In his first point, Balbirnie argues that the State failed to prove that the underlying felony of second-degree statutory rape caused Victim's death for purposes of his conviction of felony murder. In his second point, Balbirnie argues that the State failed to prove that he knew Victim was under the age of 17 to support his conviction of second-degree statutory rape. Finding no error, we affirm.
Background[2]
On September 20, 2012, Victim (born on July 19, 1997) lived with her grandparents on their farm in Willard, Missouri. Around 4:00 p.m. that day, Victim asked her grandmother if she could invite a boy over to ride horses; when her grandmother said she could not, Victim left the home on foot. Grandmother thought Victim was simply blowing off steam, but when Victim was still gone the next morning, Grandmother grew concerned and tried to file a missing person's report. But, because Victim had been gone for fewer than forty-eight hours, the report could not be filed. Grandmother contacted as many people as she could, trying to locate Victim but to no avail, and Grandmother hung fliers all around. On September 30, 2012, Victim's body was found floating in Truman Lake in Warsaw, Missouri, near Mile Long Bridge; it was wrapped in a blanket with tape, zip ties, and orange electrical cord, with a white trash bag over Victim's face, and attached to a post-driver and part of a railroad iron rail.
Grandmother identified Victim's body, and an autopsy was conducted the following day. The autopsy revealed a large volume of liquid in Victim's lungs that was not attributable to the lake in which she was found. Instead, the medical examiner believed the excess fluid to be evidence of pre-mortem pulmonary edema, a build-up of fluid in the lungs that results when a person is not breathing properly, whether from a brain injury or otherwise.
A week or two before Victim disappeared, Gwenda Bradshaw (a friend of Balbirnie) received a call from Balbirnie, seeking a ride. When Bradshaw went to pick Balbirnie up, Victim was with him; Bradshaw had never met Victim before and asked her how old she was. Victim stated she was nineteen, but Balbirnie indicated she was twenty-one. Bradshaw took Balbirnie and Victim to a friend's house, where Balbirnie and Victim "friended" each other on Facebook. Victim's Facebook page indicated she was fifteen years old.
In the early evening of September 20, 2012, a few minutes before 6:00 p.m. and after Victim left Grandmother's home, Richard Chamberlain, a resident of Springfield, Missouri (approximately five miles from Willard), encountered Victim-who appeared to be fourteen or fifteen years old-walking outside his home. Chamberlain had never seen Victim before, but she stopped at his house and asked to use his phone. Victim had the phone for a minute or two before handing it back to Chamberlain, stating that whomever she was trying to reach was not answering the phone. Victim then left Chamberlain's home, walking down the street. Shortly before 6:30 p.m., Chamberlain received a return phone call from the number Victim had tried to reach; it was a male voice, wanting to know who had tried to contact him from Chamberlain's number. Chamberlain advised that it had been a young lady walking down the street. The caller asked Chamberlain where he was located and which direction Victim had *706 gone. The phone number was later identified as belonging to Balbirnie's cell phone.
Sometime around 2:00 a.m. on September 21, 2012, Larry Warner (another friend of Balbirnie) picked up Balbirnie and Victim in Springfield and drove them to Amy Hartley's house in Buffalo, Missouri, for the purpose of "partying," which Warner defined as doing drugs and having sex. Though Warner had never met Victim, Balbirnie had spoken of her before and indicated that they had a sexual relationship. The group arrived at Hartley's home around 2:45 a.m. on September 21, 2012.
Upon their arrival, Balbirnie introduced Victim to Hartley and told Hartley that Victim was twenty-two years old. Victim asked Hartley to borrow a dress and then took a shower. While Victim was in the shower, Warner, Hartley, and Balbirnie got high on methamphetamine. After Victim got out of the shower, she went to the back bedroom and told Balbirnie, "Come on, if we're going to do this," prompting Balbirnie to follow her. At some point, Balbirnie emerged from the bedroom, completely naked with an erection, and invited Warner into the bedroom to watch, saying, "If you want to come back here, you can come back here, but you ain't touching her, you know what I'm saying?" Warner declined the invitation and left shortly thereafter.
After Warner left, Hartley went to her own bedroom. Balbirnie and Victim, both naked, then entered Hartley's bedroom and solicited Hartley to participate in sexual activities with them. Hartley initially refused but eventually assented, allowing Balbirnie and Victim to remove Hartley's pants and perform oral sex on her. Shortly thereafter, Hartley became uncomfortable, redressed, and went back into the living room. While in the living room, Hartley heard Balbirnie and Victim having sex against her bedroom door, causing it to make a banging noise. Hartley went back to the bedroom and told Balbirnie and Victim to go somewhere else, so they went into the living room, where Hartley observed them engaging in more sexual acts. Hartley encouraged them to go into the back bedroom, and she went to her own bedroom.
Sometime later, Hartley heard a loud noise and left her room to investigate. Balbirnie came out of the bedroom, wearing only shorts and looking "frazzled." Balbirnie kept going in and out of the back bedroom, and Hartley eventually followed him back there, where she saw Victim lying naked on the bed, shaking and seizing. Hartley approached Victim and asked if she was ok. Victim put her hands around her neck, "like she was choking," while she continued to shake and seize. Hartley told Balbirnie to call for an ambulance, but Balbirnie responded, "Fuck no, bitch." Hartley insisted they call, telling Balbirnie that Victim was dying. Victim eventually stopped shaking and seizing, at which point, Hartley checked her pulse and found that she had none. Hartley told Balbirnie to give Victim CPR, and when he did, Victim's body convulsed and water came out of her mouth. The CPR was unsuccessful, and Victim became still and unresponsive. Hartley asked Balbirnie, "What have you done?" Balbirnie responded, "She's been doing that for hours."
Balbirnie told Hartley, "We need to douche this bitch out" because he had ejaculated inside Victim. He then redressed Victim in the dress she had borrowed from Hartley, wrapped Victim's body in a blanket from the bed, and asked Hartley to get him some tape and a rope or cord. Hartley complied and brought Balbirnie a white trash bag, some tape, and an orange electrical cord. Balbirnie put the trash bag over Victim's head and then wrapped the cord around the blanket to keep it in place.
*707 Balbirnie carried Victim's body to the garage and put it in the trunk of Hartley's car. He then directed Hartley to "get [him] something to weight her down." Hartley suggested Balbirnie look in the sheds outside the house. Balbirnie returned from one of the sheds with a post-driver and a piece of railroad track, which he tied to Victim's body before instructing Hartley to get in the car; the two then drove around, looking for a body of water.
The pair first traveled to Pomme de Terre River, but, when they got there, Balbirnie remarked, "There's not enough water here," so they drove to Mile Long Bridge over Truman Lake. After they stopped on the bridge, Balbirnie got out of the car and looked down at the water. He told Hartley, "I'm going to throw her out." Balbirnie threw Victim's body off the bridge into the water, and he and Hartley drove away.
Balbirnie and Hartley eventually returned to Hartley's home, where Balbirnie gathered up Victim's clothing, put it in a trash bag, and drove away with the items in Hartley's car. Before doing so, however, he requested some bleach and used it to wipe down the bed where Victim had died. Balbirnie also advised Hartley to wash the bedding and not to call the police.
A few days later, Balbirnie was in a motel room, using drugs with Kayla Alexander in Springfield, Missouri. Balbirnie was behaving abnormally, prompting Alexander to ask him what was going on. Balbirnie then said that he had gotten high and had sex with a fifteen-year-old girl, during which he choked and killed her.
Victim's autopsy revealed no drugs in her system and only a small amount of alcohol, which was attributable to decomposition. Though the medical examiner was unable to testify to a cause of death, he acknowledged that Victim's death could have resulted from cerebral asphyxiation occurring in a manner consistent with the events Balbirnie had described to Kayla Alexander. The medical examiner testified that compression of the veins in the neck prohibits blood from traveling to the brain, which then deprives the brain of oxygen and other nutrients, resulting in cerebral asphyxiation, a condition that can cause seizures and pulmonary edema.
The jury found Balbirnie guilty as charged, and the court sentenced him, as a prior offender, to thirty years for felony murder and fifteen years for statutory rape, to run consecutive to each other and to concurrent terms of five years for tampering with physical evidence and five years for abandoning a corpse, for a total sentence of fifty years' imprisonment. Balbirnie appeals.
Standard of Review
"Our review is limited to determining 'whether sufficient evidence was presented at trial from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt of all the essential elements of the crime.' " State v. Gilbert , 531 S.W.3d 94, 98 (Mo. App. W.D. 2017) (quoting State v. McAllister , 399 S.W.3d 518, 521 (Mo. App. E.D. 2013) ). We accept as true all evidence and favorable inferences therefrom that support the prosecution, and we disregard all contrary evidence and inferences. Id.
Analysis
Balbirnie raises two points on appeal. In his first point, Balbirnie challenges the sufficiency of the evidence to support his felony murder conviction, arguing that Victim's death did not come about "as a result of the perpetration" of second-degree statutory rape-the underlying felony. In his second point, Balbirnie argues that the State bore the burden and failed to prove that Balbirnie knew Victim was under the *708 age of 17, as required to support his conviction for second-degree statutory rape.
A. The evidence supported Balbirnie's conviction of felony murder.
In his first point on appeal, Balbirnie argues that the evidence was insufficient to support his felony murder conviction insofar as the evidence did not establish that Victim died "as a result of the perpetration" of the underlying crime of second-degree statutory rape. Balbirnie reasons that Victim died as a result of choking (which he characterizes as an assault), rather than as a result of sexual intercourse (defined in § 566.010(4) as "any penetration, however slight, of the female sex organ by the male sex organ"). This claim is without merit.
"A person commits the offense of murder in the second degree if he ... [c]ommits ... any felony, and, in the perpetration ... of such felony ..., another person is killed as a result of the perpetration ... of such felony...." § 565.021.1(2).
Balbirnie reads the phrase "another person is killed as a result of the perpetration ... of such felony" to mean that the death must result from one of the elements of the underlying felony. He notes that the elements of second-degree statutory rape are: (1) a person age twenty-one or older; (2) having sexual intercourse; (3) with a person who is less than seventeen years old. See § 566.034.1. He then reasons that neither of the participants' ages can cause death, so, for him to be guilty of felony murder, Victim's death must have resulted from the second element-sexual intercourse. And, here, because there was no evidence that Victim's death was caused by the penetration of her vagina by Balbirnie's penis, the evidence was insufficient to support his conviction. We disagree.
"The felony murder rule derives from common law and permits a homicide to be classified as murder, even though committed unintentionally, if it occurred during the pursuit of a felony." State v. Agee , 350 S.W.3d 83, 91 (Mo. App. S.D. 2011) (quoting State v. Williams , 24 S.W.3d 101, 110 (Mo. App. W.D. 2000) ). "Missouri follows the foreseeability-proximate cause theory of felony murder in interpreting whether a death resulted from the perpetration of a felony." State v. Stallman , 289 S.W.3d 776, 779 (Mo. App. E.D. 2009). A person's "unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened." Id. (quoting State v. Black , 50 S.W.3d 778, 785 (Mo. banc 2001) ). The ultimate question is whether the underlying felony " 'set into motion the chain of events' that caused the death." State v. Burrage , 465 S.W.3d 77, 80 (Mo. App. E.D. 2015) (quoting State v. Moore , 580 S.W.2d 747, 752 (Mo. banc 1979) ).
Here, Balbirnie choked Victim while engaging in sexual intercourse with her. It is reasonably foreseeable that choking a person could cause that person's death. And, by Balbirnie's own words and theory on appeal-supported by the medical examiner's testimony at trial, his act of choking Victim was the likely cause of Victim's death. In other words, had Balbirnie not engaged in sexual intercourse with Victim, he would not have had occasion to choke her, and she would not have died as a result. Accordingly, the evidence was sufficient to support the jury's determination that Victim died "as a result of the perpetration" of second-degree statutory rape.
The Eastern District of this court recently addressed a challenge similar to that raised by Balbirnie here. In State v. Harding , 528 S.W.3d 362 (Mo. App. E.D. 2017), the defendant argued that his commission of the underlying felony-unlawful possession of a weapon-could not have caused the victim's death so *709 as to support the conviction of felony murder. The Eastern District disagreed, noting that "[t]o test causation, Missouri courts will often look at the underlying felony, generally, as well as at the facts of the particular case. " Id. at 369 (emphasis added). The court noted that "[a] death is foreseeable if the underlying felony and killing were a part of a continuous transaction, 'closely connected in time, place and causal relation.' " Id. (quoting State v. Manuel , 443 S.W.3d 669, 677 (Mo. App. W.D. 2014) ). "Missouri's felony-murder law applies to all felonies, and also allows for the circumstances of the case to guide whether the death is the 'natural and proximate result of the commission of the [underlying felony].' " Id. at 371 (quoting State v. Scroggs , 521 S.W.3d 649, 656 (Mo. App. W.D. 2017) ). The court noted that "the clear legislative intent restricts our courts from considering the inherent dangerousness (or lack thereof) of the underlying felony"; instead "we may only review the underlying circumstances to determine whether the murder was foreseeable and a proximate cause of the underlying felony." Id. In other words, while the commission of any felony "is sufficient to charge a defendant with felony-murder, [it is] the underlying facts [that] dictate whether [the underlying felony] is sufficient to convict a defendant of felony-murder." Id. (emphasis in original).
In Harding , because the weapon the defendant unlawfully possessed had been maintained, fully loaded, in a couch cushion in a home where he and the victim "were prone to frequent domestic disputes," the court ultimately held that "[i]t [wa]s the fault of Defendant that this weapon became a part of the altercation that resulted in Victim's death-i.e., his felony-possession was closely connected in time, place and causal relation to her death-and therefore completely foreseeable that such an incident would occur." Id. at 371-72.
The same is true in Balbirnie's case. Because the sexual intercourse he chose to engage in with Victim included choking her, his commission of second-degree statutory rape was closely connected in time, place and causal relation to Victim's death, and it was therefore completely foreseeable that Victim might die as a result of Balbirnie's perpetration of statutory rape. See also State v. Russell , 780 S.W.2d 126, 128 (Mo. App. E.D. 1989) (holding that there was sufficient evidence that the defendant's commission of the underlying felony of robbery caused the victim's death, despite the fact that the victim died from smoke inhalation resulting from an intentional fire set during the robbery by a codefendant). Thus, the evidence was sufficient to support his conviction of felony murder.
Point I is denied.
B. Balbirnie bore the burden of proving the affirmative defense of mistake of age and the evidence supported Balbirnie's conviction of second-degree statutory rape.
In his second point, Balbirnie argues that the evidence was insufficient to support his conviction for second-degree statutory rape insofar as the State failed to prove that he knew Victim was under the age of seventeen at the time he had sexual intercourse with her.
"A person commits the offense of statutory rape in the second degree if being twenty-one years of age or older, he or she has sexual intercourse with another person who is less than seventeen years of age." § 566.034.1. Balbirnie argues that, because § 566.034.1 does not expressly prescribe a culpable mental state for any of the elements, we are required by § 562.021.3 to apply a mental state of knowingly to each element, including the victim's age. We disagree.
*710 Section 562.021.3 provides, in pertinent part, that, "[e]xcept as provided in ... section 562.026, if the definition of any offense does not expressly prescribe a culpable mental state for any elements of the offense, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly." Though Balbirnie is correct that § 562.021.3 would typically require us to apply a culpable mental state to § 566.034 because none is provided in the statute itself, he overlooks the express exception provided by § 562.026(2). Section 562.026(2) provides that "[a] culpable mental state is not required" for a felony offense if "no culpable mental state is prescribed by the statute defining the offense, and imputation of a culpable mental state to the offense is clearly inconsistent with the purpose of the statute defining the offense or may lead to an absurd or unjust result." Here, imputing a culpable mental state would lead to absurd or unjust results.
In State v. Tompkins , 277 S.W.2d 587, 591 (Mo. 1955), the Missouri Supreme Court held that forcible rape was a strict liability offense.[3] In State v. Beishir , 646 S.W.2d 74, 79 (Mo. banc 1983), the Court held that first-degree statutory sodomy "is a crime of strict liability."[4] And, in State v. Stokely , 842 S.W.2d 77, 81 (Mo. banc 1992), the Court held that "[s]tatutory rape is a strict liability crime."[5] Though the Court in Stokely was analyzing a conviction for first-degree statutory rape, its holding was applied by our court in State v. Thompson , 361 S.W.3d 46, 50 (Mo. App. W.D. 2011), in the context of a double jeopardy challenge to convictions of both forcible rape and second-degree statutory rape. The sole distinction between first- and second-degree statutory rape is the ages of the participants.[6] Given that each of these offense definitions is drafted in similar fashion and in light of this precedent, it would seem an absurd or unjust result for second-degree statutory rape to not also be a strict liability offense, requiring no culpable mental state.
"Generally speaking, it is within the power of the legislature to declare an act criminal irrespective of the intent or knowledge of the doer. Due process is not violated by the fact that mens rea is not a required element of a crime, or the fact that a person is punished for an act in violation of the law, though ignorant of the facts making it so."
Beishir , 646 S.W.2d at 76 (quoting 21 Am. Jur. 2d Criminal Law § 138 (1981) ).[7]
This conclusion is buttressed by the existence of § 566.020.2, which provides:
*711 "Whenever in this chapter the criminality of conduct depends upon a child being less than seventeen years of age, it is an affirmative defense that the defendant reasonably believed that the child was seventeen years of age or older." "An affirmative defense is an independent bar to liability with respect to which the defendant carries the burden of persuasion that 'does not serve to negative any facts of the crime which the State must prove in order to convict' the defendant." State v. Faruqi , 344 S.W.3d 193, 201 n.3 (Mo. banc 2011) (quoting Patterson v. New York , 432 U.S. 197, 207, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) ) (emphasis added).
"Generally, where an exception is part of the section which defines the offense, the burden is on the State to plead and prove that the defendant is not within the exception." State v. West , 929 S.W.2d 239, 242 (Mo. App. S.D. 1996) ; see also State v. Holmes , 399 S.W.3d 809, 814 (Mo. banc 2013) (concluding that the inclusion of the phrase "without good cause" in the definition of criminal nonsupport rendered it an element of the offense such that the State bore the burden to prove that a defendant's nonsupport was engaged in "without good cause"). "However, where the exception is found in a separate clause or part of the statute disconnected from the definition of the offense, the exception is not for the prosecution to negate, but for the defendant to claim as a matter of affirmative defense." West , 929 S.W.2d at 242.
In Holmes , the Missouri Supreme Court faced a question about which party bore the burden with respect to the existence of lack of "good cause" justifying a defendant's criminal nonsupport. Holmes , 399 S.W.3d at 810. The statute at issue provided: "A parent commits the crime of nonsupport if such parent knowingly fails to provide, without good cause, adequate support which such parent is legally obligated to provide...." Id. (quoting § 568.040.1, RSMo Supp. 2011). Subsection 3 of the same statute provided: "Inability to provide support for good cause shall be an affirmative defense under this section. A person who raises such affirmative defense has the burden of proving the defense by a preponderance of the evidence." Id. at 812 (quoting § 568.040.3, RSMo Supp. 2011). The Court first determined that, inexplicably, "paragraph 1 makes lack of good cause an element and paragraph 3 also makes good cause an affirmative defense." Id. at 813. But, despite the strange drafting, the Court concluded that "the most logical interpretation in the circumstances is to interpret it as requiring the State to prove lack of good cause while at the same time permitting the defendant to offer additional proof that he has good cause." Id. at 814.
In discussing the potential legislative intent, the Court noted that, "had the legislature wished to remove 'without good cause' as an element but allow it as an affirmative defense, it could have removed the phrase 'without good cause' from paragraph 1 at the same time it added the affirmative defense to paragraph 3."[8] Id. In other words, if the definition of the offense did not contain the language at issue, it would no longer be an element that the State bore the burden to prove, and maintenance of the third paragraph, identifying "good cause" as an affirmative defense, would have had the effect of placing the burden on the defendant to prove *712 that his nonsupport was the result of "good cause."
This appears to be exactly the case in the context of statutory rape. Historically, in Missouri, mistake-of-age was no defense whatsoever to a charge of statutory rape:
[I]t is argued by counsel for the state that the accused may not know that the girl was under the age of consent. That may be true; but that constitutes no defense to the charge for the reason that the law makes it his duty to know the age of a girl before he defiles her person, and, if there is any doubt about her age, he must determine that fact at his peril. It is a well-known fact that some girls at the ages of 10, 12, 14, and 15 years appear to be several years older than they really are; and a man who desires to have sexual intercourse with such a girl must take notice of that fact and solve the doubt in favor of the law and morality; otherwise he must suffer the penalties of the law.
State v. Helderle , 186 S.W. 696, 700 (Mo. banc 1916) (Woodson, J., concurring); see also id. at 702 (Revelle, J., dissenting) ("Notwithstanding the honest belief of the defendant, based upon reasonable, and sometimes almost convincing, evidences that the girl is over the nonage, the law holds the male guilty, although he had no intent to have intercourse with a girl of nonage. In such a case the only intent required is the intent to have carnal knowledge of that person; he acting at his peril as to her capacity to consent."). Thus, when the legislature added § 566.020 in 1977, it was changing the law by providing a defendant with an affirmative defense that was not previously recognized, though, in doing so, it limited the availability of that defense to cases involving victims between the ages of fourteen and sixteen. See § 566.020.1 ("Whenever in this chapter the criminality of conduct depends upon a child being less than fourteen years of age, it is no defense that the defendant believed the child to be older."). The fact that the legislature added this affirmative defense in a separate section, apart from the definition of the offenses to which it applied, coupled with the fact that the legislature specifically denominated it as an affirmative defense, demonstrates the legislative intent that a defendant's knowledge of a victim's age is not an element but is, instead, a defense available to a defendant charged with second-degree statutory rape upon which he bears the burden of persuasion.
Balbirnie alternatively argues that the State was required-and failed-to disprove his mistake-of-age defense. This argument ignores the plain language of § 566.020.2, identifying a defendant's reasonable belief that a child was seventeen years of age or older as an affirmative defense. An affirmative defense is one in which "the defendant has the burden of persuasion that the defense is more probably true than not." § 556.056(2).
Contrary to the plain language of both §§ 556.056(2) and 566.020.2, Balbirnie seeks to treat the mistake-of-age defense more like a claim of self-defense, wherein a defendant bears "the burden of injecting the issue." § 563.031.5. "When the phrase 'The defendant shall have the burden of injecting the issue' is used in the code, it means [that] ... [i]f the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue." § 556.051(2). If a defendant meets his burden of injecting an issue, "the burden then shifts to the state to disprove [the defense] beyond a reasonable doubt." State v. Dulaney , 989 S.W.2d 648, 651 (Mo. App. W.D. 1999). But the same is not true of affirmative defenses. The State is not required to "disprove beyond a reasonable doubt every fact constituting any and all affirmative *713 defenses related to the culpability of an accused." Patterson , 432 U.S. at 210, 97 S.Ct. 2319. "[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged," but "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required." Id. "This analysis [in Patterson ] is consistent with Missouri law." State v. Meacham , 470 S.W.3d 744, 748 (Mo. banc 2015).
In short, Balbirnie's challenge to the sufficiency of the evidence to support his conviction of second-degree statutory rape is legally flawed because the burden of persuading the jury that Balbirnie reasonably believed Victim to be over the age of seventeen rested squarely on his own shoulders. The State's sole burden in this regard was to prove that Victim was, in fact, under the age of seventeen, which it did.
In any event, there was abundant evidence contradicting Balbirnie's defense, upon which the jury apparently relied. To begin, the evidence showed that Victim's Facebook page, which Balbirnie viewed approximately one week before her death, indicated that she was fifteen years old. Other witnesses testified that Victim appeared to be fourteen or fifteen years old. The State introduced Victim's photograph into evidence, allowing the jury to judge for itself what age she appeared to be at the time of her death. And Balbirnie not only gave inconsistent accounts of Victim's age (telling Bradshaw that Victim was twenty-one and telling Hartley that Victim was twenty-two) but also admitted knowing she was fifteen years old when he spoke with Alexander.
Because Balbirnie's claim of insufficient evidence is legally flawed, it is without merit. And, in any event, there was copious evidence upon which the jury apparently relied in rejecting his affirmative defense.
Point II is denied.
Conclusion
The evidence was sufficient to support Balbirnie's convictions. The trial court's judgment is affirmed.
Thomas H. Newton, Presiding Judge, and Victor C. Howard, Judge, concur.

All statutory references are to the Revised Statutes of Missouri, as updated through the 2012 cumulative supplement, unless otherwise noted.

We view the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution. State v. Salazar , 414 S.W.3d 606, 610 n.2 (Mo. App. S.D. 2013).

"A person commits the offense of rape in the first degree if he or she has sexual intercourse with another person who is incapacitated, incapable of consent, or lacks the capacity to consent, or by the use of forcible compulsion." § 566.030.1.

"A person commits the offense of statutory sodomy in the first degree if he or she has deviate sexual intercourse with another person who is less than fourteen years of age." § 566.062.1.

"A person commits the offense of statutory rape in the first degree if he or she has sexual intercourse with another person who is less than fourteen years of age." § 566.032.1.

"A person commits the offense of statutory rape in the second degree if being twenty-one years of age or older, he or she has sexual intercourse with another person who is less than seventeen years of age." § 566.034.1.

The Court in Beishir specifically rejected the defendant's argument that § 566.062 unconstitutionally permitted conviction upon a defendant's recklessness with respect to a victim's age. State v. Beishir , 646 S.W.2d 74, 78-79 (Mo. banc 1983). Instead, the Court upheld the conviction, obtained without a jury finding of any mental state associated with the defendant's knowledge of the victim's age, on the basis that legislative intent indicated that first-degree statutory sodomy was meant to be a strict liability crime. Id.

The legislature has since removed the "good cause" language from the definition of the offense, and maintained subsection 3, stating that "[i]nability to provide support for good cause shall be an affirmative defense under this section. A defendant who raises such affirmative defense has the burden of proving the defense by a preponderance of the evidence." § 568.040.3.