

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| ANTHONY BALBIRNIE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | **WD84667** |
| v. | ) | |
| | ) | |
| | ) | **OPINION FILED:** |
| | ) | **August 2, 2022** |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Cooper County, Missouri
The Honorable Donald Barnes, Judge**

**Before Division Two:**  Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Edward R. Ardini, Jr., Judges

Mr. Anthony Balbirnie ("Balbirnie") appeals from the judgment of the Circuit Court of

Cooper County, Missouri ("motion court"), denying his Rule 29.15 post-conviction relief motion

after an evidentiary hearing.  We affirm.

## Factual and Procedural Background[1]

Victim,[2] who was born July 19, 1997, lived with her grandparents on their farm in Willard,

Missouri.[3] On September 20, 2012, around 4:00 p.m., Victim walked off the farm after she became

---

[1] On appeal from the motion court's denial of a Rule 29.15 motion, we view the facts in the light most favorable to the verdict and judgment.  *McFadden v. State*, 553 S.W.3d 289, 296 n.2 (Mo. banc 2018).

[2] Pursuant to section 595.226.1 RSMo 2016, we have used the term "Victim" to protect the identity of the victim of an offense under Chapter 566.

[3] Many of the underlying facts are taken directly from the opinion issued by this Court in Balbirnie's direct appeal, *State v. Balbirnie*, 541 S.W.3d 702 (Mo. App. W.D. 2018), without further attribution.

upset with her grandmother. Grandmother was unconcerned initially but grew worried when she discovered that Victim was still gone the next morning. Grandmother attempted to locate Victim through multiple means, including contacting local law enforcement, calling people that knew Victim, and posting "missing person" fliers.

Richard Chamberlain, who lived approximately five miles from Willard in Springfield, Missouri, encountered Victim just before 6:00 p.m. on September 20, 2012. Victim stopped at Chamberlain's home and asked to use his phone, and Chamberlain obliged. Chamberlain had never seen Victim before but believed that she appeared to be fourteen or fifteen years old. Victim used the phone briefly before handing it back to Chamberlain, stating that whomever she was trying to reach was not answering. Victim then left Chamberlain's home. Shortly thereafter, Chamberlain received a phone call from the number Victim had tried to reach; it was a male voice. The man asked who had tried to contact him, and Chamberlain advised that it had been a young lady. The caller asked Chamberlain where he was located and which direction Victim had gone. The phone number was later identified as belonging to Balbirnie.

Sometime before Victim disappeared, Glenda Bradshaw (a friend of Balbirnie) received a call from Balbirnie requesting that she provide a ride to him in her vehicle. When Bradshaw picked up Balbirnie, Victim, whom Bradshaw had never met, was with him. Bradshaw asked Victim how old she was; Victim stated that she was nineteen, but Balbirnie indicated that she was twenty-one. Bradshaw took Balbirnie and Victim to a friend's house, where Balbirnie and Victim "friended" each other on Facebook. Victim's Facebook page indicated that she was fifteen years old.

Around 2:00 a.m. on September 21, 2012, Larry Warner (another friend of Balbirnie) picked up Balbirnie and Victim in Springfield and drove them to Amy Hartley's house in Buffalo, Missouri, for the purpose of "partying," which Warner defined as doing drugs and having sex.

2

Though Warner had never met Victim, he recalled Balbirnie mentioning her before, indicating that they had a sexual relationship.

When they arrived at Hartley's house, Balbirnie introduced Victim to Hartley and told Hartley that Victim was twenty-two years old. Victim asked Hartley to borrow a dress; Victim then took a shower. When Victim got out of the shower, she went to the back bedroom where she and Balbirnie engaged in sexual activities. At some point, Balbirnie emerged from the bedroom, naked and with an erection, and invited Warner into the bedroom to watch; Warner declined the invitation and left Hartley's house shortly thereafter. After Warner left, Hartley went to her own bedroom. Balbirnie and Victim, both naked, then entered Hartley's bedroom and solicited Hartley to participate in sexual activities with them. Hartley allowed Balbirnie and Victim to perform oral sex on her, but Hartley soon became uncomfortable and went back into the living room. Hartley later directed Balbirnie and Victim out of her bedroom to the living room, then eventually from the living room to the back bedroom. Hartley then retired to her bedroom.

Sometime later, Hartley heard a loud noise and left her room to investigate. She saw Balbirnie pacing in and out of the back bedroom, wearing only shorts and looking "frazzled." When Hartley entered the room, she saw Victim lying naked on the bed, shaking and seizing. Hartley approached Victim and asked if she was all right. Victim put her hands around her neck, "like she was choking," while she continued to shake and seize. Hartley told Balbirnie to call for an ambulance, but Balbirnie responded, "Fuck no, bitch." Hartley insisted that they call, telling Balbirnie that Victim was dying, but Balbirnie refused. Victim eventually stopped shaking and seizing, and Hartley checked her pulse and found that she had none. Hartley told Balbirnie to give Victim cardio-pulmonary resuscitation ("CPR"), and when he did, Victim's body convulsed and water came out of her mouth. The CPR was unsuccessful, and Victim became still and

3

unresponsive. Hartley asked Balbirnie, "What have you done?" Balbirnie responded, "She's been doing that for hours." Balbirnie told Hartley, "We need to douche this bitch out" because he had ejaculated inside Victim.

Balbirnie redressed Victim in the dress that she borrowed from Hartley, then wrapped Victim's body in a blanket from the bed, and asked Hartley to get him some tape and a rope or cord. Hartley complied and brought Balbirnie a white trash bag, some tape, and an orange electrical cord. Balbirnie put the trash bag over Victim's head and then wrapped the cord around the blanket to keep it in place. Balbirnie carried Victim's body to the garage and put it in the trunk of Hartley's car. He then directed Hartley to "get [him] something to weight her down." Hartley suggested that Balbirnie look in the sheds outside the house. Balbirnie returned from one of the sheds with a post-driver and a piece of railroad track, which he tied to Victim's body before instructing Hartley to get in the car. The two then drove around, looking for a body of water.

On September 30, 2012, Victim's body was found floating in Truman Lake in Warsaw, Missouri, near Mile Long Bridge; it was wrapped in a blanket with tape, zip ties, and orange electrical cord, with a white trash bag over Victim's face, and attached to a post-driver and part of a railroad iron rail.

Balbirnie and Hartley eventually returned to Hartley's home, where Balbirnie gathered up Victim's clothing, put it in a trash bag, and drove away with the items in Hartley's car. Before doing so, however, Balbirnie requested some bleach and used it to wipe down the bed where Victim had died. Balbirnie also advised Hartley to wash the bedding and not to call the police.

A few days later, Balbirnie was in a motel room, using drugs with Kayla Alexander in Springfield, Missouri. Balbirnie was behaving abnormally, prompting Alexander to ask him what

4

was going on. Balbirnie then said that he had gotten high and had sex with a fifteen-year-old girl, during which he choked and killed her.

After a change of venue from the Circuit Court of Benton County, Balbirnie was later charged in the Circuit Court of Cooper County with second-degree/felony murder (Count I), second-degree statutory rape (Count II), tampering with physical evidence (Count III), and abandonment of a corpse (Count IV). A jury trial commenced on June 20, 2016, at the conclusion of which the jury found Balbirnie guilty as charged. Balbirnie was thereafter sentenced to thirty years to life for Count I, fifteen years for Count II, five years for Count III, and five years for Count IV; Counts I and II to run consecutive and Counts III and IV to run concurrent but consecutive to Counts I and II. Balbirnie appealed, and this Court affirmed the judgment in *State v. Balbirnie*, 541 S.W.3d 702, 713 (Mo. App. W.D. 2018), concluding that "there was abundant evidence" of Balbirnie's guilt, including but not limited to, his admission to Ms. Alexander that he had sex with a fifteen-year-old, during which he had choked and killed her.

Thereafter, Balbirnie timely filed his *pro se* Rule 29.15 motion for post-conviction relief, and appointed counsel timely filed an amended motion. An evidentiary hearing was held on March 17, 2021, wherein Balbirnie appeared in person and was represented by counsel. On June 10, 2021, the motion court denied Balbirnie's claims for post-conviction relief in a twenty-eight-page judgment outlining the motion court's findings of fact and conclusions of law.

Balbirnie now appeals. Additional facts relevant to the resolution of the issues on appeal will be discussed below.

## Standard of Review

Appellate review of the denial of a post-conviction motion is limited to a determination of whether the motion court's findings of facts and conclusions of law are clearly erroneous. *Haynes*

*v. State*, 600 S.W.3d 859, 861-62 (Mo. App. W.D. 2020); *see also* Rule 29.15(k). "A motion court's findings and conclusions are clearly erroneous if this Court 'is left with the definite and firm impression that a mistake has been made' after a review of the entire record." *Propst v. State*, 535 S.W.3d 733, 735 (Mo. banc 2017) (citing *Price v. State*, 422 S.W.3d 292, 294 (Mo. banc 2014)). "Regardless of the motion court's findings and conclusions in denying the motion, we will affirm the motion court's decision if sustainable for any reason." *Morrison v. State*, 619 S.W.3d 605, 609 (Mo. App. W.D. 2021) (citing *Dorsey v. State*, 448 S.W.3d 276, 282 (Mo. banc 2014)).

## Analysis

## Point I

In Balbirnie's first point on appeal, he contends that the motion court clearly erred in denying his post-conviction relief motion in that he claims the State committed a *Brady*[4] violation when it failed to disclose statements that Hartley made to her probation officer that would have assisted Balbirnie's impeachment of Hartley as one of the State's witnesses at his criminal trial.

Hartley was originally charged as a co-defendant with Balbirnie, though she pleaded guilty to first-degree endangering a child and was sentenced to five years' imprisonment. The execution of Hartley's sentence was suspended, and she was instead placed on five years' probation beginning in 2016. Hartley was already serving a term of probation in an unrelated case when she was charged in the present case. Balbirnie's trial counsel sought to obtain the probation records in Hartley's unrelated case, including any violation reports, by serving upon the prosecution team a discovery request. But, those records were neither in the possession of the prosecution team nor were the records available in a database accessible to the prosecution team. Nonetheless, the

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

6

prosecution team contacted the Department of Probation and Parole and requested the records, and the Department refused to produce the requested records. The prosecution team then informed trial counsel that they did not possess, nor did they have access to, Hartley's probation records. Trial counsel thereafter subpoenaed the Department of Probation and Parole to a deposition to retrieve Hartley's probation records, but the Department again refused to submit to the subpoena. In response, trial counsel filed a motion to compel, which was also successfully rebuffed by the Department of Probation and Parole. Of relevance to this discussion is section 559.125.2:[5]

> Information and data obtained by a probation or parole officer shall be privileged information and **shall not be receivable in any court**. Such information shall not be disclosed directly or indirectly to anyone other than the members of a parole board and the judge entitled to receive reports, except the court or the board **may in its discretion permit the inspection of [a] report**, or parts of such report, by the defendant, or offender or his attorney, or other person having a proper interest therein.

(Emphasis added.) In short, the Department of Probation and Parole was not under any obligation to permit Balbirnie to inspect Hartley's probation records.[6]

"Under *Brady v. Maryland*, due process is violated when the prosecutor suppresses evidence that is favorable to the defendant and material to either guilt or punishment." *State v. Mosely*, 599 S.W.3d 236, 247 (Mo. App. W.D. 2020) (internal quotation marks omitted). Accordingly:

> [t]o prevail on his *Brady* claim, [Balbirnie] must show that: (1) the evidence at issue is favorable to him either because it is exculpatory or impeaching; (2) the evidence was, either willfully or inadvertently, suppressed by the state; and (3) he suffered prejudice as a result of the state's suppression.

---

[5] All statutory references are to the REVISED STATUTES OF MISSOURI 2000, as updated through the 2015 Noncumulative Supplement.

[6] Conversely, information obtained by and a probationer's communications with a probation officer would be admissible in a proceeding to determine a probationer's eligibility to remain on probation, *see generally* section 559.036, or in a criminal prosecution where the "communications or information . . . *themselves* constitute[d] the commission of a criminal offense," *State ex rel. Jones v. Prokes*, 637 S.W.3d 110, 118 (Mo. App. W.D. 2021). Here, however, Hartley's communications with her probation officer do not fit within these categories.

7

*State ex rel. Clemons v. Larkins*, 475 S.W.3d 60, 78 (Mo. banc 2015) (citing *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 338 (Mo. banc 2013)).

Here, there simply was no suppression of evidence by the prosecution team of probation and parole records that were, at all times, confidential pursuant to section 559.125. This issue has been ruled upon by Missouri's appellate courts in the recent past, to-wit:

> [I]n *Williams v. State*, 168 S.W.3d 433 (Mo. banc 2005), the Missouri Supreme Court held that a trial court did not err in denying a capital-murder defendant's request for disclosure of probation and parole records of two prosecution witnesses who testified that the defendant had made incriminating statements to them. Although the defendant was facing the death penalty and sought information concerning two of the State's primary witnesses against him, the Supreme Court held that the defendant was not entitled to discovery because "the probation and parole records are confidential under section 559.125, RSMo 2000"). *Id.* at 445.

*State v. Renfrow*, 495 S.W.3d 840, 843 (Mo. App. W.D. 2016). The Missouri Supreme Court's holding in *Williams* is applicable to and binding on our decision today. Consequently, Hartley's probation records were privileged under section 559.125.2, Balbirnie was not entitled to obtain them through discovery, and the motion court's conclusion in denying Balbirnie's post-conviction relief motion on this ground was not clearly erroneous.[7]

Point I is denied.

**Ineffective Assistance of Counsel Claims on Appeal – Points II-VI**

In Points II through VI, Balbirnie asserts various claims of ineffective assistance of counsel. We note that the record before us shows that Balbirnie was represented by three attorneys

---

[7] Additionally, Hartley's probation records were not material to Balbirnie's defense, and the absence of such evidence does not undermine confidence in the jury's verdict; hence, Balbirnie has not suffered prejudice. For, in the probation records at issue, Hartley responded to a question about the rape of the Balbirnie Victim by saying, "No, I didn't even touch her." But, Balbirnie's trial counsel was able to artfully and extensively cross-examine Hartley about her even broader denial statement to police investigators that she "didn't have anything to do with [the events regarding what happened to Victim before and after her rape and subsequent death]." *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's [alleged] evidentiary suppression 'undermines confidence in the outcome of the trial.'").

at trial who collectively devoted over 900 hours of time preparing his defense for trial and executing the defense strategy at trial. Balbirnie's lead trial counsel had tried between thirty and forty criminal jury trials in her career and she had taught trial skills for the Public Defender system for many years. Further, the second chair trial counsel for Balbirnie had been a trial attorney for the Public Defender system for over thirty years, had conducted seventy jury trials as the first-chair attorney and participated in 140 jury trials in his extensive career.

To prevail on a claim of ineffectiveness of counsel, Balbirnie must satisfy, by a preponderance of the evidence, both the *Strickland* performance and prejudice prongs. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Shockley v. State*, 579 S.W.3d 881, 892 (Mo. banc 2019); *West v. State*, 605 S.W.3d 607, 612 (Mo. App. W.D. 2020). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To show deficient performance, Balbirnie "must overcome the strong presumption [that] trial counsel's conduct was reasonable and effective," *Anderson v. State*, 564 S.W.3d 592, 600 (Mo. banc 2018), by proving "'that counsel's performance fell below an objective standard of reasonableness.'" *McNeal v. State*, 500 S.W.3d 841, 844 (Mo. banc 2016) (quoting *Taylor v. State*, 382 S.W.3d 78, 80 (Mo. banc 2012)). The choice of one reasonable strategy over another is not ineffective assistance of counsel. *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). "'Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance.'" *Cunningham v. State*, 640 S.W.3d 807, 810 (Mo. App. W.D. 2022) (quoting *Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019)).

9

To prove prejudice, Balbirnie must show "that a reasonable probability exists that 'but for' counsel's errors the proceeding would have had a different result." *Fields v. State*, 642 S.W.3d 774, 779 (Mo. App. W.D. 2022). "If either the performance prong or the prejudice prong is not met, then [we] need not consider the other, and [Balbirnie's] claim must fail." *Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019) (internal quotation marks omitted).

On the topic of the *Strickland* prejudice prong, the evidence of Balbirnie's guilt is overwhelming. Balbirnie's friend, Kayla Alexander, testified that she spent time with Balbirnie shortly after Victim's rape and murder, and Balbirnie admitted to Alexander that he had sex with a fifteen-year-old girl, the sex had been rough and included Balbirnie choking her, and the violent sex had resulted in the death of the fifteen-year-old girl. Balbirnie's phone is the one that had called Richard Chamberlain searching for Victim on the date of her disappearance. Another friend of Balbirnie, Glenda Bradshaw, picked up Balbirnie on the same date and personally observed that Victim was with Balbirnie at that time. Balbirnie's friend, Larry Warner, then drove Balbirnie and Victim to Amy Hartley's home in Buffalo, Missouri, for the express purpose of "doing drugs and having sex." Hartley admitted to participating in inappropriate sex acts with Balbirnie and Victim, but when she later found Victim in the back bedroom with Balbirnie naked, convulsing, and choking, Balbirnie refused her demand that he call emergency personnel. And, upon Victim's death, he instructed Hartley to "douche this bitch out" because he had ejaculated inside her. He then instructed Hartley to assist him in his attempt to hide and decompose Victim's corpse by wrapping Victim with weighted material and throwing her over a bridge into Truman Lake. Balbirnie's cell phone records also placed him in the area where, and at the time when, Victim became unresponsive and died. And, Balbirnie's cell phone was mysteriously turned off during the time Hartley claims she and Balbirnie were attempting to destroy evidence. Based upon these

10

facts, Balbirnie simply cannot satisfy the prejudice prong on *any* of his ineffective assistance of counsel claims and, hence, all of his ineffective assistance of counsel claims must fail. That said, we briefly comment on the *Strickland* performance prong claims of Balbirnie's Points II-VI.

In Point II, Balbirnie asserts an ineffectiveness claim due to trial counsel's failure to cross-examine Warner about his cell phone records. The gist of Balbirnie's argument is that he could not have thrown Victim's body into Truman Lake between 5:45-6:15 a.m. as suggested by the State's witnesses because Warner's cell phone records, *which were admitted at trial*, showed that he left Buffalo at 5:51 a.m. on September 21, 2012, and Victim was "alive" when Warner left Buffalo. First, though Warner testified that the last time he saw Victim she was alive, he did *not* testify that he saw her alive *at 5:51 a.m.* Second, the cell phone records were in evidence, and trial counsel used that evidence to make the very argument in closing argument that Balbirnie asserts should have been made, and trial counsel did not subject the defense to the possible trap that Warner may not have known if Victim was still alive when he left (had he been questioned on that topic). Third, though it is Balbirnie's burden of proving what Warner would have testified to in the post-conviction relief evidentiary hearing, Balbirnie presented no such evidence. *See Fields v. State*, 625 S.W.3d 479, 482 (Mo. App. W.D. 2021) ("Failure to present evidence at a hearing in support of factual claims in a post-conviction motion constitutes abandonment of that claim."). Fourth, the defense strategy was to cast Warner as a liar in every way, and trial counsel did not want to overshadow that strategy with the notion that Warner would sometimes be telling the truth, at least if the testimony was helpful to the defense. *See Beck v. State*, 637 S.W.3d 545, 555 (Mo. App. W.D. 2021) (stating that a strategic decision to pursue one reasonable trial strategy to the exclusion of another equally reasonable trial strategy will not serve as a basis for holding that counsel was ineffective). Finally, "[w]hen the testimony of a witness will only impeach the State's

11

witness, relief on a claim of ineffective assistance of counsel is not warranted." *Rios v. State*, 368 S.W.3d 301, 309 (Mo. App. W.D. 2012) (internal quotation marks omitted). Balbirnie has failed to meet the *Strickland* performance prong as to Point II.

In Point III, Balbirnie asserts an ineffectiveness claim due to trial counsel's failure to cross-examine Warner as to why his cell phone number *allegedly* appeared on Victim's Facebook page on September 15, 2012, when Warner had testified that he did not know Victim before September 20, 2012. First, it is not this Court's responsibility to search the record for facts supporting contentions made by Balbirnie on appeal, *State v. Smith*, 33 S.W.3d 648, 652 (Mo. App. W.D. 2000), but our thorough review of the record shows no evidence whatsoever that Warner's cell phone number appeared on Victim's Facebook page at *any* time. Second, although a leading question by motion counsel may have *suggested* that Warner's cell phone number appeared on Victim's Facebook page, it is a fundamental rule of evidence that "[a] question is not evidence." *Storey v. State*, 175 S.W.3d 116, 153 (Mo. banc 2005). Third, a "[f]ailure to present evidence at a hearing in support of factual claims in a post-conviction motion constitutes abandonment of that claim." *Fields*, 625 S.W.3d at 482 (internal quotation marks omitted). Balbirnie has failed to meet the *Strickland* performance prong as to Point III.

In Point IV, Balbirnie asserts an ineffectiveness claim due to trial counsel's failure to object to Warner's testimony at trial that Victim did not deserve what happened to her. "Decisions about whether or when to make objections at trial are left to the judgment of counsel." *Hays v. State*, 484 S.W.3d 121, 128 (Mo. App. W.D. 2015) (internal quotation marks omitted). "[T]he mere failure to object to everything objectionable[ ] does not equate to incompetence." *Wickizer v. State*, 617 S.W.3d 885, 889 (Mo. App. W.D. 2021) (internal quotation marks omitted). "In many instances[,] seasoned trial counsel do not object to otherwise improper questions or arguments for

strategic purposes." *Id.* (internal quotation marks omitted). "Trial strategy decisions may be a basis for finding ineffective assistance of counsel only if that decision was unreasonable." *Thompson v. State*, 606 S.W.3d 679, 682 (Mo. App. W.D. 2020) (quoting *Anderson*, 564 S.W.3d at 600). Here, trial counsel did not want to highlight Warner's testimony by objecting to it, and that decision was sound and reasonable. Balbirnie has failed to meet the *Strickland* prejudice prong as to Point IV.

In Point V, Balbirnie asserts an ineffectiveness claim due to trial counsel's failure to cross-examine Warner about Warner's alleged prior assault on another woman, A.T.[8] The incident involving A.T. is wholly unrelated to the events surrounding the rape and tragic death of Victim in the present case. "'Evidence is logically relevant if it tends to make the existence of a material fact more or less probable.'" *State v. Hudson*, 643 S.W.3d 679, 685 (Mo. App. W.D. 2022) (quoting *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002)). Warner's alleged assault on A.T. did not have the legitimate tendency to establish either Warner's or Balbirnie's guilt or innocence in the murder of Victim, nor did it have the legitimate tendency to make any other fact or consequence in this case more or less likely. "Logically relevant evidence is admissible only if legally relevant. Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* (quoting *Anderson*, 76 S.W.3d at 276). Introducing any evidence about Warner's alleged assault on A.T. would have had the serious tendency to confuse the issues and mislead the jury; Balbirnie was on trial for the crimes he committed against Victim, Warner was *not* on trial for the crimes he allegedly committed against A.T.[9] "Trial counsel will not be found

---

[8] Though A.T. is not the victim in these proceedings, we nevertheless respectfully decline to disclose any identifying information about her.

[9] The doctrine of curative admissibility, or "opening the door," as it is commonly termed, "'allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial

13

ineffective for failing to present inadmissible evidence." *Tisius v. State*, 519 S.W.3d 413, 422 (Mo. banc 2017). Balbirnie has failed to meet the *Strickland* prejudice prong as to Point V.

In Point VI, Balbirnie asserts an ineffectiveness claim due to trial counsel's failure to cross-examine Victim's grandmother for allegedly reporting to the prosecution team that Victim's Facebook page identified Victim as seventeen years old, and not fifteen as Balbirnie's friend, Glenda Bradshaw, had testified the Facebook page showed. First, at the post-conviction relief evidentiary hearing, Victim's grandmother testified that she didn't even know how to use Facebook and, hence, never would have made a false assertion about Victim's Facebook page showing an age that the grandmother would have known to be inaccurate. And, the motion court, as it is expressly entitled to do, determined that the Victim's grandmother was credible. *Lane v. State*, 644 S.W.3d 1, 3 (Mo. App. W.D. 2022) (stating that the motion court assesses credibility of the witnesses). Second, trial counsel expressly noted that the trial strategy with Victim's grandmother at trial was to be respectful of her and to have her exit the witness stand as soon as possible, since she was the most likeable witness that the State would call in the criminal trial; this trial strategy was eminently reasonable and, as we discussed previously in relation to our discussion of Point IV, we will not convict trial counsel of pursuing one reasonable trial strategy to the exclusion of another equally reasonable trial strategy. *See also Payne v. State*, 509 S.W.3d 830, 837 (Mo. App. W.D. 2016) (explaining that movant's argument that trial counsel should have conducted additional cross-examination of the State's witness "amounts to nothing more than second-guessing counsel's methods for carrying out [their] reasonable trial strategy simply

---

use of *related* evidence on direct examination.'" *Barnett v. State*, 103 S.W.3d 765, 773 n.5 (Mo. banc 2003) (emphasis added) (quoting *United States v. Durham*, 868 F.2d 1010, 1012 (8th Cir. 1989)); *see also State v. Betts*, 559 S.W.3d 47, 58 (Mo. App. E.D. 2018) (quoting *State v. Shockley*, 410 S.W.3d 179, 194 (Mo. banc 2013)). What Warner was asked by the police, what he told the police, and Victim's blameworthiness was not in any way *related* to Warner's potentially criminal conduct against a person that was not the victim, a witness, or the defendant in this case. Hence, we will not permit Balbirnie to bootstrap his argument for admissibility of inadmissible evidence by attempting to characterize it as "curative admissibility."

because his defense was ultimately unsuccessful").  Third, as we detailed in *Balbirnie*, 541 S.W.3d at 713, Balbirnie's own inconsistent accounts of Victim's age to Bradshaw and Hartley and his admission to Alexander that Victim was fifteen years old, are such that the complaint that he raises today simply does not unqualifiedly support a defense strategy that Balbirnie thought that Victim was an adult.  "Trial counsel is not ineffective for not offering evidence that would not have unqualifiedly supported the defense theory." *Collings v. State*, 543 S.W.3d 1, 17 (Mo. banc 2018). Similarly,

> [f]ailure to impeach a witness does not generally warrant relief for ineffective assistance of counsel where the facts, even if true, do not establish a defense.  The decision to impeach is presumed to be a matter of trial strategy, and to overcome such presumption, a movant must demonstrate that the decision was not a matter of trial strategy and that the impeachment would have provided him with a defense or would have changed the outcome of the trial.

*Kelley v. State*, 618 S.W.3d 722, 740 (Mo. App. W.D. 2021) (quoting *Wren v. State*, 313 S.W.3d 211, 219 (Mo. App. E.D. 2010)).  Balbirnie has failed to meet the *Strickland* performance prong as to Point VI.

Because Balbirnie can satisfy neither the *Strickland* performance or prejudice prongs on any of his claims of ineffectiveness of counsel asserted in his Points II through VI, all of those points on appeal are denied.

### Point VII

In Balbirnie's seventh and final point on appeal, he contends that the motion court clearly erred in denying his post-conviction relief motion in that the State knowingly presented false and misleading evidence at trial.  Specifically, Balbirnie asserts that the State knew Bradshaw's testimony that Victim's Facebook page identified Victim as fifteen years old was false because Grandmother previously informed the prosecutor that Victim's Facebook page identified Victim as seventeen years old.

15

"To prevail on this theory, [Balbirnie] must show (1) the witness'[s] testimony was false; (2) the [S]tate knew it was false; and (3) the conviction was obtained as a result of the perjured testimony." *Ferguson v. State*, 325 S.W.3d 400, 407 (Mo. App. W.D. 2010) (internal quotation marks omitted). Balbirnie cannot demonstrate any of the elements required to prevail on his claim.

There is no evidence that Bradshaw testified falsely about the age she saw on Victim's Facebook page. And, Victim's grandmother testified credibly at the evidentiary hearing that she did not have personal knowledge of Victim's Facebook page to enable her to give an accurate account of its contents. And, once more, Balbirnie failed to prove that Victim's Facebook page, in fact, identified her as anything other than fifteen years old as Bradshaw testified. Thus, Balbirnie cannot meet the first element identified by *Ferguson*. And, if there is no proof that Bradshaw testified falsely, there can be no proof that the State "knew" her testimony was false; therefore, Balbirnie cannot meet the second element identified by *Ferguson*. Finally, Balbirnie's conviction was obtained as a result of the overwhelming evidence of his guilt discussed previously in our ruling today and not as the result of any alleged perjured testimony; hence, the third element identified by *Ferguson* has not been established by Balbirnie.

Point VII is denied.

### Conclusion

The findings and conclusions of the motion court itemized in its twenty-eight-page judgment below are clear, cogent, thorough, and legally correct and certainly not clearly erroneous. Accordingly, we affirm.

/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Judge

Thomas N. Chapman, Presiding Judge, and Edward R. Ardini, Jr., Judge, concur.

16