

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD84633 |
| | ) | |
| KYLR CHARLES YUST, | ) | Opinion filed: August 1, 2023 |
| | ) | |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF CASS COUNTY, MISSOURI
## THE HONORABLE WILLIAM B. COLLINS, JUDGE

Division Two: W. Douglas Thomson, Presiding Judge,
Cynthia L. Martin, Judge and Thomas N. Chapman, Judge

Kylr Yust appeals from his convictions for voluntary manslaughter and second-degree murder following the deaths of K.K.[1] and J.R. Yust was sentenced to 15 years' imprisonment for voluntary manslaughter and life imprisonment for second-degree murder.

Yust brings six points on appeal. First, Yust argues that the trial court erred in excluding the testimony of two witnesses, Billy Bayes and Joseph Stauch, who offered alternate perpetrator evidence as to who killed K.K. In his second and third points, Yust

---

[1] Pursuant to Section 595.226, we redact the names of the victims, their families, and any other individual who is the victim of domestic violence from this opinion.

argues that the trial court erred in excluding both a surveillance video and testimony relating to the surveillance video that Yust argues supports another alternate perpetrator theory as to who killed both K.K. and J.R. In his fourth and sixth points, Yust argues that the trial court erred in admitting evidence of his prior bad acts, which he argues is inadmissible. Finally, in his fifth point, Yust argues that the State failed to present evidence sufficient for the jury to find beyond a reasonable doubt that he knowingly killed J.R.

Finding no error, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY[2]

K.K. was a junior at Belton High School when she went missing in 2007 while dating Yust, who was 18 years old at the time. Nine years later, J.R. also went missing while dating Yust. Their bodies were discovered in the same location in the woods near Belton in April 2017 by a mushroom hunter.

**K.K.'s Disappearance**

On May 4, 2007, K.K. went to school, but left early and never returned home. At the time of her disappearance, Yust and K.K. had been dating for approximately nine months. Various friends described their relationship as "toxic," "bad," and "high-strung." K.K. confided in friends that Yust was abusive and she was scared of him, but she did not know how to handle his violent outbursts.

Approximately two weeks before her disappearance, K.K. spoke with a friend, Amy Clark, and stated that she intended to break it off with Yust. K.K. spoke to Yust on the phone while at Clark's house, intending to break up with him. Yust came to Clark's house

---

[2] This Court must view the evidence in a light most favorable to the verdict and give the State the benefit of all reasonable inferences. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003).

to pick K.K. up.  Later, K.K. returned to Clark's house with bruising around her neck and a swollen bottom lip.

On April 28, 2007, about a week later, K.K. was working at Popeyes Chicken when Yust showed up to give K.K. a gift.  Yust attempted to convince K.K. to spend time with him when she got off work, but she refused because she had prior plans.  When K.K. finished working, Yust was waiting for her in the parking lot.  She again refused to hang out.  Yust then grabbed K.K., forced her into his truck, locked the door, and drove off.  Eventually, Yust dropped K.K. off.  K.K. contacted the police to report the incident and was "very agitated and upset" by the incident.

The next Monday, April 30, 2007, K.K. and her mother went to the Cass County Circuit Court to seek an order of protection against Yust.  In her petition for an order of protection, K.K. noted several instances of violence, including: (1) that Yust had kidnapped her on April 28, 2007; (2) that Yust had choked her a month before the report; (3) that in December 2006, Yust held a knife to K.K.'s throat and threatened to slit it; and (4) in March 2007, Yust restrained her at his home and would not let her leave.  K.K. noted on the form that she felt like she was "in immediate, present danger of abuse."  K.K. received an ex parte order of protection against Yust on the same day.

Yust was served with the order of protection on May 1, 2007, three days before K.K. went missing.  Yust and K.K. remained in contact.  On the day she went missing, May 4, 2007, Yust and K.K. texted throughout the morning, and at 9:13 a.m., K.K. called Yust.  K.K. left the school at 9:19 a.m.  Yust then picked K.K. up from school.

At 10:25 a.m., K.K. called Kyle Reynolds, a close friend of Yust's who was a member of the same death metal band as Yust.  K.K. asked Reynolds if he wanted to hang out with her and Yust.  It was unusual for K.K. to call Reynolds.  Reynolds declined the offer

3

because he had a job interview later in the morning. K.K. never made another phone call. Between 1:00 p.m. and 2:30 p.m., Yust came to Reynolds's house and was agitated. Reynolds believed at the time that Yust's actions were out of character for Yust.

K.K.'s friends became worried later in the day when they could not reach her. At approximately 5:20 p.m., Clark reported to the Belton Police Department that she could not contact K.K. and was worried. A Belton police officer attempted to contact K.K. by calling her cell phone. K.K.'s phone was never recovered.

In the following days, various police officers followed leads concerning K.K.'s disappearance, including questioning Yust. Yust voluntarily spoke with the police several times. Yust admitted that his relationship with K.K. was stressful and that he was upset that she was hanging out with other people.

The investigation into K.K.'s disappearance went cold. However, even as the case was cold, Yust confessed to at least six people that he killed K.K.

First, Yust confessed to Katelynn Farris, whom he dated when Farris was between 16 and 17 years old. Yust told Farris that he took K.K. to his apartment and she was never seen again. In 2010, Farris agreed to wear a wire for the FBI to assist in their investigation into K.K.'s disappearance. Farris spent a day with Yust recording their conversations. During those conversations, Yust told Farris that he strangled K.K. and threw her in the middle of the woods. Yust also told Farris that he panicked after killing K.K. and had to think quickly about where to dump her body. Yust also said that "if he could take anything back, [cheating on Farris] or killing [K.K.], it would be cheating on [Farris]."

In late 2009 or early 2010, Yust confessed to Nick Yeates, a friend of Yust's. During their conversation, Yust told Yeates that he had killed K.K. because she had not loved him. Yust said that he "just snapped and that something bad had happened to [K.K.]." Yeates

4

also later agreed to wear a wire for the FBI. During his recorded conversation with Yust, Yust coached Yeates on how to handle an upcoming interview with the FBI regarding Yust's involvement in K.K.'s disappearance.

Yust also confessed to another girlfriend, C.M., in the summer of 2010. C.M. was 17 years old when she dated Yust and lived with him in Kansas City. One night, C.M. was packing her bags in their shared bedroom, prepared to leave Yust, when Yust discovered her. Yust got on top of C.M. and began choking her with both hands. While he was choking C.M., Yust said, "I have killed ex-girlfriends before out of sheer jealousy. I will kill you before you can let another scream out of your throat." C.M. repeatedly lost consciousness during the attack, but each time, Yust woke her up by punching her in the legs, saying "that he was not finished with [her] yet." C.M. awoke the next morning to find Yust in bed with her, telling her that he loved her "and if [she] was good, it would never happen again." Sometime later, after C.M. saw some "Find [K.K.]" posters around their shared apartment, Yust told C.M. that he was collecting the posters to place in K.K.'s parents' yard. Yust also told C.M. that "something bad happened to [K.K.]" and he "remembered dragging her through the woods and that she was heavy."

Yust also confessed to his roommate, Seth Duncan, in 2012. Yust told Duncan that he and K.K. were arguing when the argument escalated and he "choked [K.K.] out." Yust also told Duncan that after he choked K.K., he took her body to the woods. Duncan told police about Yust's confession in 2012.

In 2013, Yust confessed to Aaron Caponetto and Nicholas Kirkbride while he was staying with them for a few days. Yust came back to their house one night "very intoxicated" with a near-empty bottle of whiskey and was "extremely upset." Yust asked Caponetto if he "had ever loved somebody so much … that [he] would rather see them

5

dead than with somebody else." Yust then told Caponetto that he had strangled K.K. to death. Yust also told both Caponetto and Kirkbride that he would tell them the location of K.K.'s body if they worked with him on a music project that would end with Yust "blow[ing] his brains out over all the audience." Yust also threatened to kill both men if they told anyone about Yust's confession or plan. Caponetto eventually informed the police of Yust's confession after J.R. went missing.

**J.R.'s Disappearance**

In September 2016, 21-year-old J.R. was living with her boyfriend of almost 3-and-a-half years, Jaxxon Mallett, in Kansas City, Missouri. Mallett and Yust were close friends, and J.R. knew Yust through Mallett. In early 2016, Mallett suffered a medical event that required an extended hospital stay. After Mallett was released from the hospital, he noticed that J.R. was "distant" and asked if J.R. was sleeping with Yust. J.R. admitted that they were. Mallett cut off all contact with Yust but tried to work on his relationship with J.R. Mallett and J.R. continued to live together.

J.R. and Yust remained in contact even as she worked on her relationship with Mallett, and they exchanged emails, texts, and calls throughout the summer of 2016. Yust came to J.R. and Mallett's house several times late at night or early in the morning to bang on their door. Yust's behavior concerned Mallett, who sent Yust an email stating, "Don't contact me again. Stop coming to my house. Just stop."

On September 8, 2016, J.R. was recovering from emergency surgery for a ruptured appendix. She planned on going to hang out with a new friend, Allyn Alvarado, to drink wine and relax. Alvarado invited only J.R. and another friend to his house, but J.R. arrived with Yust, who was intoxicated. Yust was upset that Alvarado was spending time with J.R.

6

While they were spending time at Alvarado's house, Yust became extremely upset for various reasons. At some point, Yust roughly grabbed Alvarado and left marks and bruises on Alvarado's arm. As Yust escalated, Alvarado told J.R. that she and Yust needed to leave.

Yust tried to drive J.R.'s car but crashed her car into Alvarado's mother's car. Yust and Alvarado briefly argued about the damage to the car before they drove away with J.R. driving. J.R. was never seen again.

The next morning, on September 9, 2016, Yust's grandfather took Yust to work between 6:00 and 7:00 a.m. Yust lived with his grandfather. As they were leaving, Yust's grandfather noticed J.R.'s car was parked in front of his house.

That same day, J.R. had a follow-up appointment for her surgery at 2:00 p.m. J.R.'s mother was planning on accompanying J.R. to her appointment and arrived at J.R.'s house shortly before the appointment. J.R.'s car was not home and J.R.'s mother could not reach her daughter by phone or text. J.R.'s mother began to worry and called Mallett, who said that J.R. had not come home the night before and he had not seen her since the previous evening.

Yust left work early that day and called his mother, asking her to have his half-brother, Jessup Carter, call him. Carter and his then-girlfriend, Crystal Taylor, dropped their children off with Yust's mother before driving to Kansas City around 5:00 or 5:30 p.m. Carter and Yust were not close, and Carter was confused as to why Yust needed his help. Carter and Taylor arrived at Yust grandfather's house between 7:00 and 7:30 p.m.

The three left Yust's grandfather's house to go to Carter's uncle's house to get a gas can and use the uncle's burn barrel. Police officers executed a search warrant on the burn barrel on September 14, 2016, and recovered several pieces of fabric and a portion of a

7

belt buckle from the burn barrel. They also found a black cell phone case next to the burn barrel.

At some point in the evening, Alvarado called Yust to tell him that J.R. was missing. Yust did not offer to help find J.R., instead telling Alvarado to file a missing person report if he was worried about J.R.

After going to Carter's uncle's house to use the burn barrel, Yust, Carter, and Taylor returned to Yust's grandfather's house. Taylor watched television while Carter and Yust left for 30 to 45 minutes. When they returned, Taylor noticed that Carter looked "shocked" and "scared." All three then left Yust's grandfather's house. Carter saw Yust throw a shirt into the neighbor's bushes before they left.

The three drove to Carter's cousin's house. Carter took a gun from his cousin's house and gave it to Taylor.[3] The three got back in the car and continued to drive. During the drive, Yust threw his cell phone out of the window and told Carter and Taylor to remove the batteries from their phones. Taylor complied because she was scared.

The three were pulled over by Henry County deputies around 3:02 a.m. the morning of September 10, 2016. Yust began panicking and said, "[s]omebody might as well just [] kill me now." The deputies asked Yust, Carter, and Taylor to step out of the car. One of the deputies recognized Yust because they had gone to elementary school together. That deputy noticed that Yust was pale, clammy, and that his knees were shaking, all of which the deputy stated was a "[m]ajor red flag." The deputies discovered the gun in Taylor's waistband and confiscated it. After issuing Carter a citation, the three were free to leave.

---

[3] Carter was a felon and could not legally possess a firearm, which is why he gave the firearm to Taylor.

The three arrived at their destination, an abandoned trailer owned by Carter's family friend, in the early morning hours. Carter and Taylor left Yust at the trailer with some nonperishable food and went to Yust's mother's house to pick up their children. Someone at Yust's mother's house called law enforcement.

That same very early morning, at approximately 1:41 a.m. on September 10, 2016, a witness was driving home from work when he saw a large fire off Blue Parkway in Kansas City near Yust grandfather's house. That witness called 911 and stayed until emergency services arrived, at which time the witness saw that a car was on fire. Firefighters extinguished the fire and the car was towed to the Kansas City Police Department secured lot. The burning vehicle was later identified at J.R.'s Chevy Equinox.

Yust was arrested at the abandoned trailer on September 11, 2016, in relation to J.R.'s missing person case. At the time he was arrested, Yust had fingernail scratches and burns on his face, and his hair was singed.

During the investigation into J.R.'s disappearance, police officers who specialized in bomb and arson investigations determined that J.R.'s car fire was started using gasoline and an unknown ignition source. Yust's burns and injuries were consistent with a flash fire caused by gasoline. Officers also found the shirt that Taylor had seen Yust throw into a neighbor's bush. DNA testing revealed that both Yust and J.R. were possible contributors to the DNA profiles. Officers also executed a search warrant on Yust's grandfather's home and found apparent blood in the basement.

While jailed in September 2016, Yust spoke with his mother on the phone and confessed to killing J.R.:

> Yust: All those times that you didn't show up [for visitation] was my grandpa's fault?

| | |
|---|---|
| Mother: | So that's why you go out and kill a girl? |
| Yust: | That's part of it. |
| Mom: | Give me a break. |
| Yust: | That's part of it. |

***

| | |
|---|---|
| Mother: | That's why you did it? |
| Yust: | A big huge part of it, you and Kenny, yeah. |
| Mother: | Wow, Kylr. |
| Yust: | I would say about 50-50. |

Yust also told his mother that he planned on telling people where J.R.'s body was. He stated to his mother, "I'm not ever going to be out again, you realize that, right?" In a different call to his mother, Yust agreed he acted alone and that Carter and Taylor had nothing to do with J.R.'s disappearance. On that call, Yust's mother asked him to tell J.R.'s family where her body was because she knew that Yust had dragged J.R. into the woods.

Despite the evidence against Yust, the investigation into J.R.'s disappearance and likely death went cold because her body had not yet been recovered.

On April 3, 2017, a mushroom hunter was walking on a game trail in a wooded area near Y Highway and 233rd Street in Peculiar, Missouri. As he was searching for mushrooms near the trail, he noticed what he thought was a "shiny-looking ball" in the distance. As the mushroom hunter approached the object, he realized it was a skull. He contacted law enforcement, who arrived on the scene and began recovering the skeletal remains. Shortly into the recovery process, a second skull was found. J.R.'s remains were identified using her dental records. DNA from the second skull was used to identify K.K.'s remains.

10

The recovery process yielded approximately fifty bones from each woman. Medical examiners determined that neither K.K. nor J.R. were buried and no clothes were recovered from the area. K.K.'s bones were more weathered, indicating that she had been exposed to the environment for "a very long time." J.R.'s bones were consistent with her death occurring in September 2016 when she went missing. The medical examiner was unable to determine a cause of death based on the few remains recovered from both K.K. and J.R. As such, the medical examiner could not rule out strangulation as a cause of death for both women.

Yust was charged with two counts of first-degree murder for the killing of both K.K. and J.R. The jury found Yust guilty of voluntary manslaughter for K.K.'s death and second-degree murder for J.R.'s death. The jury recommended that Yust be sentenced to fifteen years' imprisonment for K.K.'s death and life imprisonment for J.R.'s death. The trial court adopted the jury's recommended sentences and ordered the sentences run consecutively.

This appeal follows.

## II. STANDARD OF REVIEW

Most of Yust's points challenge the admissibility of various evidence. To the extent that different standards of review apply to Yust's points, we will articulate the proper standard of review for those points below.

"We review the decision to admit or exclude evidence at trial for abuse of discretion." *State v. Jackson*, 636 S.W.3d 908, 919 (Mo. App. W.D. 2021) (citing *State v. Gibbons*, 629 S.W.3d 60, 83 (Mo. App. W.D. 2021)). "A trial court abuses its discretion when its 'ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks

11

the sense of justice and indicates a lack of careful, deliberate consideration.'" *State v. Ratcliff*, 622 S.W.3d 736, 744 (Mo. App. W.D. 2021) (quoting *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020)). "'[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.'" *State v. Brandolese*, 601 S.W.3d 519, 533 (Mo. banc 2020) (quoting *State v. Brown*, 939 S.W.2d 882, 883-84 (Mo. banc 1997)) (alteration omitted).

Error alone does not require reversal. *Id.* Yust must also demonstrate that he was prejudiced by the admission of the evidence. *Id.* at 533-34. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *State v. Gibbons*, 629 S.W.3d 60, 83 (Mo. App. W.D. 2021) (quoting *State v. Suttles*, 581 S.W.3d 137, 145 (Mo. App. E.D 2019)) (internal quotations and citations omitted).

## III. ANALYSIS

Yust brings six points on appeal. First, Yust argues that the trial court erred in excluding the testimony of two witnesses, Billy Bayes and Joseph Stauch, who offered alternate perpetrator evidence as to who killed K.K. In his second and third points, Yust argues that the trial court erred in excluding both a surveillance video and testimony relating to the surveillance video that Yust argues supports another alternate perpetrator evidence as to who killed both K.K. and J.R. In his fourth and sixth points, Yust argues that the trial court erred in admitting evidence of his prior bad acts, which he argues is inadmissible. Finally, in his fifth point, Yust argues that the State failed to present

12

evidence sufficient for the jury to find beyond a reasonable doubt that he knowingly killed J.R.

Because some of Yust's points are related, we address certain points together. For ease of reading, we also address Yust's points out of order.

**POINT I**

In his first point on appeal, Yust asserts the trial court erred when it sustained the State's objection and excluded testimony by Billy Bayes and Joseph Stauch concerning "Bayes' repeated admissions to Stauch that he caused K.K.'s death and disposed of her body[.]" Specifically, Yust claims this "crucial evidence" of third-party culpability was admissible under the hearsay exception announced in *Chambers v. Mississippi*, 410 U.S. 284 (1973). We disagree.

**Discussion**

Relevant to this point are two offers of proof made by Yust during trial, the first from Bayes and the second from Stauch. During the offer of proof from Bayes, Bayes testified he was aware individuals had stated he had made statements to them concerning his involvement in K.K.'s death. However, Bayes denied ever telling anyone of his involvement in such, including Stauch. In fact, Bayes denied even knowing Stauch.

Stauch testified to the contrary during the second offer of proof, stating Bayes was an "acquaintance" and "customer" of his, having sold him crystal methamphetamine around 2007 and 2008. Stauch asserted he saw Bayes every day in 2007, and that shortly after becoming aware that a Belton girl had gone missing, he had a conversation with Bayes. In this conversation, Stauch alleged that Bayes stated he, two other men, and "the missing Belton girl" were partying together. Stauch testified Bayes told him that the missing girl was doing drugs and "then they shot her up and she [overdosed]." Stauch

13

stated Bayes further told him that the girl died when they started to take her to the hospital, after which "they just disposed of the body." Stauch also testified Bayes mentioned this to him more than once, and that Bayes was worried he would be imprisoned for life "for shooting her up and her [overdosing]."

In not allowing Stauch to testify in this respect, the trial court stated:

I believe there's a three-prong test that's involved with the determination of permitting a hearsay statement come [sic] in under due process if I remember on these cases. And one that is particularly concerning is reliability with regards to the witness in this case, and the other two prongs I don't think have been met either with regards to the – the exception under the hearsay and due process.
(Tr. 2857:10-18).

In his Point I, Yust asserts that *Chambers* requires this testimony be allowed. Under *Chambers*, a hearsay statement may be admissible as a declaration against penal interest when (1) the statement was originally made and subsequently offered under circumstances that provided considerable assurance of its reliability, and (2) the statement, if admitted and believed, would exonerate the defendant. 410 U.S. at 300-02; *State v. Blankenship*, 830 S.W.2d 1, 7 (Mo. banc 1992).

However, *Chambers*' applicability has been limited in Missouri. "In Missouri, there is no general exception to the hearsay rule for statements against penal interest except insofar as the Supreme Court's ruling in *Chambers v. Mississippi* requires such statements to be admitted to comport with due process." *State v. Scroggs*, 521 S.W.3d 649, 657 (Mo. App. W.D. 2017) (citations omitted). A declaration against penal interest is therefore admissible as a due process right "only if the declarant is shown to be *unavailable* as a witness, there are considerable assurances of the statement's reliability, and the statement, if true, would exonerate the defendant." *State v. Davidson*, 982 S.W.3d 238, 242 (Mo. banc 1998) (emphasis added) (citation omitted). "But such

14

statements 'are *never* admissible unless the declarant is unavailable to testify as a witness.'" *State v. Proudie*, 493 S.W.3d 6, 11 (Mo. App. E.D. 2016) (emphasis added) (quoting *State v. Chapman*, 876 S.W.2d 15, 19 (Mo. App. E.D. 1994)).

Here, Bayes was the declarant of the statement at issue, and his availability as a witness was clearly demonstrated when he testified at trial during the offer of proof. Accordingly, *Chambers* does not apply to render Bayes' statement admissible.[4] Additionally, even if Bayes had been unavailable as a witness, his alleged statement fails to meet the requisite level of reliability prescribed in *Chambers*.

> *Chambers* set forth three indicators of reliability as follows: the statement needs to be (a) unquestionably against interest, (b) spontaneously made to a close acquaintance, and (c) corroborated by other evidence in the case. All three indicia of reliability must be satisfied before the statements may be admitted under *Chambers*.

*Scroggs*, 521 S.W.3d at 658 (internal citations omitted). Yust has failed to identify any other evidence that corroborates Bayes' alleged statement. Yust argues only that Bayes had been "a consistent suspect[,]" but that fact does not constitute evidence corroborating Bayes' alleged statement that he injected K.K. with drugs, causing her to overdose, and then disposed of her body. Without any evidence corroborating Bayes' statement, it

---

[4] Contrary to Yust's assertion, Missouri's application of *Chambers* does not violate his right to due process. (App. Br. 42). In fact, the United States Supreme Court stated in *Chambers,*
> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that *under the facts and circumstances of this case* the rulings of the trial court deprived Chambers of a fair trial.

410 U.S. at 302-03 (emphasis added). And, the Court itself has further noted the limited nature of *Chambers* applicability as "an exercise in highly case-specific error correction":
> [T]he holding of *Chambers* – if one can be discerned from such *a fact-intensive case* – is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Montana v. Egelhoff*, 518 U.S. 37, 52-53 (1996) (emphasis added).

cannot be admitted under either *Chambers* or Missouri's version of *Chambers* as seen in *Davidson*. *See Davidson*, 982 S.W.2d at 242.

Lastly, Yust has failed to meet the basic requirement of demonstrating that Bayes committed an act directly connecting him to K.K.'s murder. In Missouri, it has been established that to introduce evidence showing another person committed the charged crime, there must be proof that the other person committed an act directly connecting him to the crime. *Proudie*, 493 S.W.3d at 11 ("Generally, a defendant may introduce evidence tending to show that another person committed the charged offense, *but only if* there is proof that the other person committed some act directly connecting him with the crime") (emphasis added). "'Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.'" *State v. Rousan*, 961 S.W.2d 831, 848 (Mo. banc 1998) (quoting *State v. Umfrees*, 433 S.W.2d 284, 288 (Mo. banc 1968)).

Here, Bayes' alleged confession to Stauch described only an unnamed "missing Belton girl." At no point during Stauch's testimony did he assert *Bayes* ever stated the missing girl was K.K.; rather, Stauch's testimony indicates he simply assumed it was K.K., and did so without any explanation as to *why* he assumed it was K.K. Such speculation and uncertainty concerning this girl's identity is insufficient to establish a direct connection to the disappearance or death of K.K.[5] Adding to this is the lack of other evidence directly connecting Bayes to the crime. Indeed, and as previously stated, outside

---

[5] *Cf. State v. Bowman*, 337 S.W.3d 679, 687-88 (Mo. banc 2011) (alternative perpetrator evidence inadmissible where defendant "relie[d] solely on [the alternative perpetrator]'s alleged opportunity to commit the murder and speculative connections to link [him] with [the] murder.").

16

of Bayes' alleged statement the only other "evidence" Yust points to is that Bayes had been "a consistent suspect" and questioned by law enforcement. But merely being investigated as a suspect does not establish the requisite direct connection to K.K.'s death to allow the admission of the desired testimony. *See State v. Bowman*, 337 S.W.3d 679, 688 (Mo. banc 2011) ("[T]he fact that [the alternative perpetrator] was investigated as a suspect and may have had an opportunity to murder [the victim] does not establish the requisite direct connection to her death").

The trial court did not abuse its discretion.

Point I is denied.

## POINTS II and III

In Yust's second point, he argues that the trial court erred in excluding Exhibit U-1, which contained two video clips and a photo from a surveillance camera, because Yust properly established a foundation for the admission of the evidence. In his third point, Yust argues that the trial court erred in excluding the testimony of Tony Armstrong, who was in possession of the videos and photo in Exhibit U-1 when they were turned over to the police, because Tony's testimony was reliable and relevant. Yust argues that the video and Tony's testimony were logically and legally relevant to support the defense's theory that Jessup Carter was in the Kansas City area by late afternoon on September 9, 2016, contrary to the testimony of Taylor, Carter's girlfriend, who testified they did not come to Kansas City until much later in the evening.

We need not address whether it was an abuse of discretion for the trial court to exclude this evidence. Even if it was (an issue we do not decide), Yust did not suffer prejudice as a result of the exclusion of the evidence. Regardless, whether Carter arrived in Kansas City at 4:30 p.m. or later in the evening on September 9, 2016, the evidence

established that J.R. was last seen late on September 8, 2016 when Yust left Alvarado's house with J.R.; that J.R. was notably missing by 2:00 p.m. on September 9, 2016 when she failed to meet with her mother to attend a scheduled medical appointment; and that J.R.'s car was inexplicably in Yust's grandfather's driveway at 6:00 or 7:00 a.m. on the morning of September 9, 2016. Carter's arrival in Kansas City post-dated all of these events regardless of the admission of Exhibit U-1 or Tony's testimony. There is no reasonable probability that the jury would have reached a different conclusion had this excluded evidence been admitted.

Points II and III are denied.

## POINTS IV AND VI – ADMISSIBILITY OF PROPENSITY EVIDENCE

In his fourth and sixth points, Yust argues that the trial court erred in admitting certain evidence of Yust's prior bad acts. In Point IV, Yust argues that the trial court erred in allowing C.M., Yust's ex-girlfriend, to testify that Yust repeatedly choked her until she lost consciousness. In his sixth point, Yust argues that the trial court erred in allowing K.K.'s mother to testify that Yust choked K.K. and threatened to slit her throat.

"[G]enerally, evidence of uncharged crimes, wrongs, or acts is inadmissible to show an accused is predisposed to criminal conduct." *State v. Goodwin*, 43 S.W.3d 805, 815 (Mo. banc 2001) (citing *State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999)). "Nevertheless, 'evidence of the defendant's prior misconduct is admissible when it is logically relevant—it has some legitimate tendency to directly establish the accused's guilt of the charges for which he is on trial[—] and when it is legally relevant—its probative value outweighs its prejudicial effect.'" *State v. Sprofera*, 427 S.W.3d 828, 835 (Mo. App. W.D. 2014) (alterations in original) (quoting *State v. Uptegrove*, 330 S.W.3d 586, 593

18

(Mo. App. W.D. 2011) (overruled on other grounds, *State v. Porter*, 439 S.W.3d 208 (Mo. banc 2014)).

Missouri courts allow evidence of prior uncharged misconduct in several circumstances: "'to prove motive, intent, the absence of mistake or accident, a common plan or scheme, or [the] identity of the person charged with committing the crime.'" *Id.* (alterations in original) (quoting *State v. Glover*, 389 S.W.3d 299, 301 (Mo. App. S.D. 2013)). Such evidence is also admissible if it is "part of the circumstances or the sequence of events surrounding the offense charged...to present a complete and coherent picture of the events that transpired." *State v. Miller*, 372 S.W.3d 455, 474 (Mo. banc 2012) (internal quotations and citations omitted). "It is also well established that when admissible evidence is inseparable from evidence which implicates defendant in another crime, the evidence is usually admissible in its entirety." *State v. Henderson*, 826 S.W.2d 371, 374 (Mo. App. E.D. 1992). "It has also been held that if it is relevant to prove the defendant's guilt of the particular crime of which he is being tried, and not merely to show the defendant's bad character or his disposition to commit the crime, the evidence of the separate crimes is admissible." *State v. Whitman*, 788 S.W.2d 328, 337 (Mo. App. E.D. 1990) (citing *State v. Rose*, 727 S.W.2d 919, 921 (Mo. App. W.D. 1987)).

Further, "[i]n cases involving adult abuse, a defendant's history of violent or threatening conduct towards the same victim 'can be especially probative.'" *State v. Whitaker*, 405 S.W.3d 554, 559 (Mo. App. E.D. 2013) (quoting *State v. Stewart*, 343 S.W.3d 373, 379 (Mo. App. S.D. 2011)).

**Point IV – C.M.'s testimony regarding Yust choking her**

At trial, the following exchange occurred between the State and C.M., who dated Yust after K.K. went missing but before J.R. went missing:

19

STATE: As the defendant has his hands around your throat, what does he say to you?

C.M.: "I have killed ex-girlfriends before out of sheer jealousy. I will kill you before you can let another scream out of your throat."

STATE: Did this attack continue for an extended period of time?

C.M.: Yes. The —

STATE: Tell the jury what happened.

C.M.: The defendant repeatedly choked me, and then as soon as I would lose consciousness or come near to losing consciousness, he would turn around and punch my legs to wake me up, saying that he was not finished with me yet.

C.M. also testified that Yust told her that "something bad happened to [K.K.]" and that he "remembered dragging her through the woods and that she was heavy."

Yust argues that C.M.'s testimony is inadmissible propensity evidence and does not fit into any of the exceptions that make uncharged misconduct admissible. We disagree. C.M.'s testimony was admissible for several reasons. First, C.M. testified that Yust admitted both to killing ex-girlfriends in the past and that he dragged K.K. through the woods. These admissions are logically relevant to whether Yust committed the crimes for which he was charged; namely, K.K.'s murder. Yust stating that he killed ex-girlfriends "out of sheer jealousy" also provided a motive to his killing of K.K., making it logically relevant. Further, Yust's admissions are legally relevant as their probative value in admitting what he had done and why he had done it clearly outweigh the prejudicial effect of the evidence. As such, Yust's confession to C.M. is admissible.

20

Similarly, the circumstances surrounding Yust's confession were also admissible. Yust's actions against C.M. also provided a motive for K.K.'s death: the spurned lover. C.M. testified that Yust found her packing her bags in preparation to leave him, and his actions against her followed. Similarly, Yust told others that he killed K.K. because she did not love him and told C.M. that he had killed ex-girlfriends out of sheer jealousy. Further, Yust's actions in choking C.M. to the point of unconsciousness then beating her to "wake [her] up" denotes the seriousness of the statements he made; this was not mere braggadocio. Accordingly, Yust's violence towards C.M. was "inseparable from the evidence which implicates [him] in another crime," and thus, "the evidence is usually admissible in its entirety." *Henderson*, 826 S.W.2d at 374. C.M.'s testimony was relevant to prove that Yust killed K.K. and was thus admissible. The trial court did not abuse its discretion in allowing C.M. to testify in this regard.

Further, even if C.M.'s testimony was improperly admitted, Yust was not prejudiced by its admission. As we lay out in more detail in the statement of facts above, Yust admitted to five people (excluding C.M.) that he strangled K.K. to death. Yust also admitted to some of those individuals that he strangled K.K. because he discovered that she did not love him. Yust also confessed to his mother on a recorded jail phone line that he killed J.R. These confessions, even excluding the confession Yust made to C.M., represent an overwhelming evidence of Yust's guilt. And, such was not the only evidence presented against Yust, but rather there was overwhelming evidence of Yust's guilt as described elsewhere herein. In short, C.M.'s testimony did not prejudice Yust because of the overwhelming evidence against him.

**Point VI – K.K.'s mother's testimony regarding restraining order**

At trial, K.K.'s mother testified that she went with K.K. to file an order of protection on April 30, 2007. K.K.'s mother read the restraining order to the jury. K.K.'s mother noted that K.K. wrote, "Saturday 4/28, kidnapped, restrained. One month ago, choked me. December of '06, had knife in his hand and said, 'I'm going to slip – slit your motherfucking throat.' March '07, wouldn't let me out of the house." K.K. also marked on the form that she felt like she was in "immediate, present danger of abuse." The restraining order was entered into evidence.

Yust acknowledges that evidence of his "history of violent or threatening conduct towards the same victim can be probative." To overcome the relevance of K.K.'s mother testimony regarding the restraining order, Yust argues that the evidence was more prejudicial than probative because it "only showed [Yust] to be a volatile and dangerous person, the type of person who would commit the charged crimes." We disagree. K.K.'s mother's testimony that K.K. sought a restraining order against Yust less than a week before K.K. went missing does not demonstrate that Yust was merely the "type of person who would commit the charged crimes." Rather, K.K.'s mother's testimony demonstrated that Yust had a motive to kill K.K. Such a motive – that he was upset by the end of his relationship with K.K. – is consistent with the *six* confessions he made to various people that he killed K.K. by strangling her because he believed she did not love him. The contents of the restraining order were also consistent with the testimony of several of K.K.'s friends that her relationship with Yust was abusive. K.K.'s mother's testimony and the restraining order were thus admissible and the trial court did not abuse its discretion.

Because both C.M.'s testimony, K.K.'s mother's testimony, and the restraining order were admissible, Points IV and VI are denied.

**POINT V**

22

In Yust's fifth point, he alleges that the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence because the State failed to prove beyond a reasonable doubt that Yust possessed the required mental state at the time of J.R.'s death as required in Count II.

**Standard of Review**

"When a criminal defendant challenges the sufficiency of the evidence to support a conviction, this Court's review is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense could have been established beyond a reasonable doubt." *State v. Reed*, 181 S.W.3d 567, 569 (Mo. banc 2006) (citing *State v. Burrell*, 160 S.W.3d 798, 801 (Mo. banc 2005)). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005) (citing *State v. Tisius*, 92 S.W.3d 751, 763-64 (Mo. banc 2002)). "In reviewing the sufficiency of the evidence, we do not reweigh the evidence, and the test is not whether we believe the evidence established the defendant's guilty beyond a reasonable doubt. *State v. Glaze*, 611 S.W.3d 789, 794 (Mo. App. W.D. 2020).

**Discussion**

Yust was convicted of second-degree murder in Count II for J.R.'s death. To be convicted, the jury had to find beyond a reasonable doubt that Yust "[k]nowingly cause[d] the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person." Section 565.021, RSMo. Section 562.016.3 states, "A person 'acts knowingly', or with knowledge:

(1) With respect to his or her conduct or to attendant circumstances when he or she is aware of his or her conduct or that those circumstances exist; or

(2) With respect to a result of his or her conduct when he or she is aware that his or her conduct is practically certain to cause that result."

"Because direct evidence of a defendant's mental state rarely exists, circumstantial evidence is sufficient." *State v. Meyers*, 333 S.W.3d 39, 48 (Mo. App. W.D. 2010) (citing *State v. Baldwin*, 290 S.W.3d 139, 143 (Mo. App. W.D. 2009)). "The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and the defendant's subsequent conduct." *State v. Hineman*, 14 S.W.3d 924, 927-28 (Mo. banc 1999).

Yust argues that the evidence is "silent" as to how J.R. died and what mental state Yust possessed in killing J.R. We disagree. Yust's conduct before and after J.R.'s death indicates that Yust knowingly killed J.R. Before her death, J.R. was last seen with Yust leaving a party where Yust's aggressive behavior caused the party's host, Alvarado, to demand that Yust and J.R. leave. The evidence established that Yust was not happy with the fact the J.R. was spending time with Alvarado. J.R. and an angry Yust left in J.R.'s car, and J.R. was never seen again. Further, when Yust was arrested, the State presented evidence that he had "scratch marks" on his face, ostensibly from running into a tree. Alvarado testified Yust had no scratches on his face when Yust left his house with J.R. Further, initially after J.R.'s disappearance, Alvarado contacted Yust, worried because he could not locate J.R. Yust showed no concern and simply advised Alvarado to file a missing person report.

The State also presented evidence that Yust took steps to destroy evidence after J.R. went missing. At this point, Yust contacted his brother, Carter, with whom he was not close, to come to Kansas City from his home more than an hour away. Upon Carter's

24

arrival, the two located gas cans. Yust was arrested with burn marks across his face and hands and singed hair after J.R.'s car was discovered on fire and after Yust was seen using a burn barrel to discard certain clothing and other items. Yust also secreted a shirt in nearby bushes which ultimately was found to have both his and J.R.'s DNA upon it. Disposing of evidence such as Yust did is relevant in determining the defendant's mental state. *See, e.g., State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002).

After this, Yust left with Carter, heading toward the town where Carter lived. He threw his cell phone out the car window and instructed Carter and Taylor to remove the batteries from their cell phones. Upon being stopped by a deputy sheriff, Yust appeared very nervous, so much so that his legs were shaking. After the traffic stop concluded, Yust was delivered to an abandoned mobile home. He had brought non-perishable food with him. He stayed at the abandoned mobile home until arrested by law enforcement. This evidence of flight is also relevant in determining the defendant's mental state. *Id*.

In addition, Yust admitted to his mother while he was in jail following his arrest that he had killed J.R. He told her he would never be out of jail again. During a phone call from jail, Yust blamed his actions on his mother's failure to show up for visitation at his grandpa's home, stating "All those times you didn't show up was my grandpa's fault?" Mother then questioned, "So, that's why you go out and kill a girl?", to which Yust replied, "That's part of it." The conversation continued:

> Mother: So that's why you did it?
>
> Yust: A big huge part of it, you and Kenny, yeah.
>
> Mother: Wow, Kylr.
>
> Yust: I would say about 50-50.

25

Yust's statements are inconsistent with J.R.'s death being the result of an accident. Moreover, Yust deposited J.R.'s body unceremoniously in the woods, very near where K.K.'s body had been deposited years before, permitting a reasonable inference that Yust knowingly caused J.R.'s death and wanted to prevent her body from being discovered.

Based on the totality of the circumstances, Yust's actions both before and after J.R.'s disappearance and death are sufficient evidence from which the jury could determine that Yust acted knowingly in killing J.R. Viewing the evidence in a light most favorable to the verdict, we find that the State presented sufficient evidence that Yust knowingly caused J.R.'s death. Point V is denied.

## CONCLUSION

The trial court's judgment is affirmed.

_____

W. DOUGLAS THOMSON, JUDGE

All concur.